## In re CHOPAK.

Misc. No. 1082.

District Court, E. D. New York.

June 17, 1946.

T. Vincent Keogh, U. S. Atty., for Eastern District of New York, of Brooklyn, N. Y. (Frank J. Parker, Asst. U. S. Atty., of Brooklyn, N.Y., of counsel), for United States.

Clarence H. Fay, of New York City, for Jules Chopak.

Before INCH, MOSCOWITZ, BYERS, and ABRUZZO, District Judges.

PER CURIAM.

This proceeding was initiated by order to show cause signed by the Senior Judge on April 3, 1946, directing the respondent to appear before this Court on May 1, 1946, to show cause why he should not be dealt with in accordance with the rules and practices of this Court concerning unprofessional conduct; and in lieu of personal appearance he filed an affidavit verified April 29, 1946.

A bill of particulars had been filed on April 15th, containing copies of certain letters written by the respondent, to which reference will be made, an excerpt from his testimony before a special master appointed by this court in the case of Cathey v. Bethlehem Steel Company, and a copy of the letter written to one of the Judges of this Court (who has not participated herein) on March 25, 1946, which gave rise to this proceeding.

There are no disputed issues of fact, since it is admitted that the respondent

signed and sent all of the said letters, and testified as shown in the said transcript.

The applicable rule of this Court may be quoted for ready reference:

"Rule 3 * * *

"Unprofessional conduct on the part of a member of this Bar requiring discipline, shall include fraud, deceit, malpractice, conduct prejudicial to the administration of justice,[1] or a failure to abide by any of the provisions of the Canons of Ethics of the New York State Bar Association."

The relevant Canons read:

"1. The Duty of the Lawyer to the Courts.—It is the duty of the lawyer to maintain towards the Courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the Bar against unjust criticism and clamor. Whenever there is proper ground for serious complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities. In such cases, but not otherwise, such charges should be encouraged and the person making them should be protected."

"3. Attempts to Exert Personal Influence on the Court.—* * * A lawyer should not communicate or argue privately with the Judge as to the merits of a pending cause, and he deserves rebuke and denunciation for any device or attempt to gain from a Judge special personal consideration or favor. * * *"

The letter which gave rise to this proceeding bears the date stated and the following caption:

"Honorable ——————
Judge United States Court
Eastern District of New York
Brooklyn 1, New York

Re: Order Cathey v. Bethlehem Steel Co. returnable for signature March 26, 1946.

Dear Sir:

In the light of my past experiences before you, I think it is futile and a waste of stationery to submit a counter order to you for signature.

I think signing this order in its form in its entirety is despotic and in excess of authority as well as deliberately taking advantage of your office to rule with passion and vehemence.

If a specific proceeding was presented to you and you referred the specific proceeding for reference, regardless of justice of so doing, which, of course, is answered that it is correctible on appeal to the Appellate Court, why should your Referee and you deliberately go out of your way to decide a matter which was not embraced in the proceeding and go beyond the issues just so as to show an example of authority.

I protest the signature of this order in this form.

If I had the slightest notion that a counter order would even be considered I would submit one.

No copy of this letter is sent to any other attorney or person as a proposed counter order need not be served.

Respectfully (sic),
Jules Chopak".

The 5 days' notice of settlement of the proposed order to which the foregoing communication referred had been given on March 21, 1946, and the order was signed on the 26th, and it confirmed a report of a referee, fixed his fee, and directed the distribution of $9,053.2{, the amount of a verdict recovered by the plaintiff in the said action, so that the respondent's successor as attorney for the plaintiff and the respondent together received the amount of the contingent fee originally agreed to by the plaintiff (50%), the expenses of the reference, and the plaintiff's own participation in the said verdict.

An understanding of the respondent's conduct requires reference to the antecedent developments, which will be stated in the inverse order of their occurrence.

Under date of January 22, 1946, the same Judge had signed an order appointing Samuel C. Duberstein Referee to take testimony concerning a proper disposition of $9,054.-24[2] which had been paid to the Clerk of this

---

[1] (Compare Sec. 88, Supp. 2, Judiciary Law of State of New York, Consol.Laws, c. 30).

[2] (There seems to be a difference of $1 not explained.)

Court in full satisfaction of the judgment obtained by the plaintiff in the said action on December 19, 1945.

That order was granted pursuant to a petition of Milton Koerner which recited the retention of this respondent by the said plaintiff in February of 1945 in connection with his cause of action against the Bethlehem Steel Company, upon a contingent fee basis of 50% of any verdict or settlement; that the suit was begun and services were rendered by the respondent pursuant to the terms of his written retainer, and that on September 19, 1945, Koerner was substituted as attorney for the plaintiff at the instance of the plaintiff and as a result of a motion made for that purpose.

That the respondent had made disbursements which were chargeable to the plaintiff, and had made a personal loan to him.

That on September 24, 1945, the plaintiff, respondent and Koerner made a written agreement to the effect that Koerner was to receive 40% of the 50% contingent attorney's fee, and the respondent the remaining 60% thereof (namely, 30% of the entire sum recovered).

That as the result of the trial held in December of 1945, the plaintiff recovered a verdict which resulted in a judgment in the sum of $9,054.24, which was paid to the Clerk of the Court on December 19, 1945.

That Koerner had made disbursements in connection with the litigation of $432.05.

That the plaintiff was indebted to the Hartford Accident and Indemnity Company to make a refund by reason of money that he had collected under the Federal Compensation Law. This aspect of the matter has no present bearing.

The petition recites the various sums due to various persons according to his computation, and his petition was accompanied by schedules of disbursements made by both attorneys, and a copy of the agreement or stipulation of September 24, 1945.

In opposition to the prayer of the petition, Cathey, the plaintiff, appeared by still another attorney, one Norman B. Johnson, and filed an affidavit verified January 7, 1946, which is quite discursive in explanation of his reason for causing Koerner to be substituted for the respondent, and in which reference is made to the fact that the respondent had brought an action against Cathey in the New York City Court in the County of New York, to recover judgment for the services rendered by him, and the affidavit contains this paragraph: "The plaintiff submits that from the aforesaid account of the proceedings herein, it is manifestly unfair and inequitable a recovery of the attorney Chopak based on a thirty (30%) percent proportion pursuant to the Stipulation of September 28, 1945, be permitted or directed by the Court and that the said attorney be allowed to profit to that disproportionate extent by the course of conduct he has pursued in these proceedings."

And the affidavit continues with a prayer that respondent's fee be fixed at not to exceed 15% of the amount of the judgment.

Attached to that affidavit is a letter—one of those contained in the bill of particulars in this proceeding—to which reference will be made.

By affidavit verified January 8, 1946, the respondent, in opposing the motion, averred among other things:

"There is no diversity of citizenship between us (the plaintiff and the respondent) and the amount involved exclusive of costs does not exceed the sum of $3,000. * * *

"I do not grant or consent to the jurisdiction of this court to determine my rights.

 *  *  *  *  *  *

"So long as I am not paid at least the sum of $2,797.30, I object to any order granting any payment to the plaintiff."

The respondent filed an affidavit verified January 15, 1946, also in answer to Koerner's petition, seeking an adjournment of the motion and stating that he appeared "specially to oppose".

Further:

"There is now pending undetermined a plenary suit in the City Court of the City of New York, County of New York, between myself and the plaintiff above named. I respectfully request this court to defer action upon this motion in any event until after that court has acted upon the matter, or at least a Motion for Summary Judgment now pending before that Court.

"Accordingly, I ask that this motion be adjourned for all purposes to January 23, 1946, since I am now legally engaged on trial in another court."

On January 22, 1946, the Judge, being confronted with these conflicting assertions constituting an exceptional condition, made the order of reference in the exercise of his authority under Rule 53 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

In order to understand certain matters that developed before the Referee, it is necessary to state the facts concerning the substitution of Koerner for the respondent, which was made pursuant to order made by still another Judge (also not sitting in this cause) and dated September 18, 1945, which was based upon:

(1) An affidavit of the plaintiff, verified September 5, 1945, in which he asked that an order be made fixing the reasonable value of the respondent's services from the commencement of the action to the date of the order sought, and directing that the sum so fixed be a lien upon the cause of action and any sum realized by way of judgment or settlement.

(2) An affidavit by Koerner, reciting the 50% contingent retainer, his belief that the cause of action was meritorious, and his client's statement that he had lost confidence in the respondent, which was the reason that the substitution was sought.

An affidavit of respondent, verified September 10, 1945, apparently in opposition to the motion for substitution, contains a paragraph which reflected upon his successor, and an unnamed official; it is indicative of the respondent's propensity for abusing those who may not be in accord with his own views. Had the respondent appeared in this proceeding, he would have been given the opportunity to substantiate the following accusation: "also what part he (Koerner) played in the decision on the part of the plaintiff to repudiate a settlement plan between us, which we discussed and the vehicle, to wit, personnel connected with the District Attorney's Office of Kings County, who being unable to practice law by statute, nevertheless for a money consideration arranged, encouraged or induced the plaintiff to arbitrarily reject my services and to deprive me of my just benefits from my employment".

It now becomes necessary to examine the letters embraced in the bill of particulars:

The first was written to Cathey on June 9, 1945, and recites a proposed settlement in the sum of $3,500, and contains the following, referring to a consultation with the Judge who granted the order of substitution: "I do not know who the Judge will be in October. Some Judges I do not like. Maybe I won't want the October Judge. * * * Doctor Stookey's last report was so dangerous and so sharply antagonistic to you, that it alone could be made ground for a jury to turn us out without a nickel (That is, if they wanted to feel prejudiced for any reason or to think, even if false, that you were a fakir (sic). There is no guarantees about juries. I think they stink)".

The second is a letter of September 21, 1945, written to Koerner, in which the following occurs:

"* * * I would be willing to put you in shape for October 3rd immediately, so as to give you as much time to carry out your inspiration for a trial or a quick turnover and Cathey his pleasure of his speculation and his trying his conclusions with white people from the eastern district.

"If you get stuck, I get stuck and so will Cathey get stuck.

"If you go places, I take my limit, by contract or compromise, even though I know that you have taken the cream that I was almost in possession of. I hope you can do as well.

"I nearly wrote a word which I believed but which would have been libelous per se, but not in fact, and so I withdrew it as I do not want to be sued for any libels."

The third was written by the respondent to the plaintiff under date of September 28, 1945, in which he recited the services that he had rendered, and commented upon his own capacity—which he by no means underrated—and the letter contains the following: "I forced your matter to a conference with Judge ———— when I was yet your lawyer. In it, he had the power, right

and duty to mediate between the parties and the lawyers in your cause. To him, you were just another name and another case. I brought Mr. Fay along, caused him to participate to break the resistance of prejudice."

The fourth letter was written on October 3, 1945, by the respondent to Koerner, and contains the following:

"Next, my advices are as follows:

"1. The case should be jockeyed to keep position and get over to * * * next month, even though Bull does not like * * *. This latter may force a better settlement. I am not sure that I gauge Bull as a speculator."

"6. Brush up on Taylor and Abramson as doctors. Further doctors your own taste. Drop all fancied medical theories not yet discovered by me. I disavow all of them as 'baloney'."

In the proceedings before the Referee, as will be seen from the transcript, the respondent testified that he had not told his client that the Judge who granted the substitution was prejudiced against Cathey because he was a negro, but he didn't know whether he had put that in writing; being shown the third letter of September 28th, he was asked: "Q. Prejudice of whom? A. Against me; I am a Jew, and I will add also that he (plaintiff) was a colored man. I think that also is a prejudice."

The referee admonished the respondent that the reflection was unfounded and uncalled for and should be the subject of a public statement by way of apology, whereupon the respondent said: "Mr. Chopak: I agree with you, Judge, perhaps it is more heated than anything else and on sober reflection I would have deleted that paragraph in that letter."

In the respondent's affidavit filed in this proceeding, verified April 29, 1946, in referring to the foregoing reflection upon the Judge, the respondent averred: "3. I admit the stenographic report of the remarks with reference to Judge * * *, which was not voluntarily given, which was provoked in the heat of and by cross-examination interrogations and which was privileged as well; I made immediate retroaction (sic) and withdrawal immediately on calling to my attention of the impropriety. I then felt and now express my whole regret, wholly retract herein and withdraw the same as wholly unwarranted, the statements having been based upon the following misconceptions and errors; I had never met nor heard before of Judge * * * except in name; had never met him as a lawyer, district attorney or judge; had never had special or any other dealings with him before; would not have known who he was before, if I had met him before; did not know his general views, disposition and procedures, nor his personal views or feelings, if any."

The implication of the foregoing is arresting; apparently it means that the respondent's ignorance concerning the Judge in question vindicates his having ascribed prejudice to him.

It must be understood that this was addressed to a person in humble circumstances who, in all probability, had no more knowledge concerning that Judge than the respondent now professes. In ascribing prejudice to the Judge, he does not even plead the extenuating circumstance of provocative experience. When it is realized, further, that this letter was written by his former lawyer to a plaintiff whose cause was yet to be tried, the harm which the expression was calculated to accomplish (according to the respondent's own version of what he meant) was that of poisoning the plaintiff's mind against the Judge who might be required to conduct his trial.

We hold this to be conduct prejudicial to the administration of justice, aggravated by the fact that the plaintiff was a person who ought to be spared from the impact of the forces unfortunately at work to promote racial discord, rather than exposed thereto by an officer of the Court. The recantation contained in the affidavit of April 29, 1946, came later by seven months and was not made to the recipient of the letter.

The same affidavit contains many quotations from judicial opinions, and much by way of argument, but nothing withdrawing the abusive comments in the letter heretofore quoted in full. The respondent contents himself with stating at some length

what he conceives to be justification for the expressions reflecting upon the Judge, going back for some years and involving matters neither germane to this subject, nor tending incidentally to excuse or even explain his personal hostility to a respected member of this Court.

That letter may lend itself to the construction that it was intended to influence a judicial act by ex parte pressure, which is prohibited by the provisions of Canon 3 quoted at the outset.

True, the communication is not framed in such a form as to be likely to accomplish the respondent's obvious purpose of preventing confirmation of the Referee's report, but its calculated hostility may have been resorted to in the hope of adroitly bringing that result about.

This cause was ordered for hearing on May 1, 1946, upon the said order of April 3, 1946, and the answering affidavit of April 29, 1946, on which occasion the respondent did not appear in person, but was represented by attorney. It appeared that the respondent desired to have the matter submitted, and after some discussion his attorney was informed by the Senior Judge as follows: "If we come to the conclusion that any of us desire the presence of Mr. Chopak for examination then through me I will arrange with Mr. Fay (his attorney) to fix a convenient time for that to take place * * *."

All papers and records in the civil case having been examined, and the Court being of the view that the respondent should appear in person to answer such questions as might be put to him, an order was signed by the Senior Judge on May 22, 1946, and on that day personally served upon the respondent in his office, directing him to appear in person before the Court on June 3, 1946, at 10:30 a.m. On that day the Court as now constituted convened; the matter was called, and the respondent failed to appear. Again the same attorney was present, stating that he appeared as a friend and adviser of the respondent, but not as his attorney.

The Senior Judge read into the record a letter received from respondent on May 29th stating inter alia "I do not expect to appear for further hearing". Whatever may be thought of this abrupt and summary refusal of an attorney to comply with the terms of a Court order duly issued in a proceeding involving his professional status, as a subject apart from the other matters involved, it is clearly consistent with the respondent's attitude toward this Court as revealed in the entire history of the litigation under examination.

The record as a whole demonstrates a complete lack of understanding, on the part of the respondent, of his obligations as a member of the Bar of this Court toward the institution in which he conducts a client's cause.

Emphasis is loaned to the respondent's conception of the lack of restraint appropriate to his calling, by a letter written by him under date of June 4th to those now sitting, containing newspaper clippings and comments upon the decision by the Supreme Court on June 3d, in Pennekamp v. State of Florida, 66 S.Ct. 1029, 1048, concerning the latitude of denunciation accorded to the Press in commenting upon Courts and Judges, with special reference to a concurring opinion which says, in speaking of that concept: "It also includes the right to criticise and disparage, even though the terms be vitriolic, scurrilous or erroneous."

Seemingly the respondent feels that a lawyer is no more constrained than are newspapers, to speak his mind freely and without reserve concerning judicial acts and conduct with which he may not be in accord, in a case in which he has a contingent interest.

It ought not to be necessary to point out the distinction between the fair requirements of deportment on the part of a member of the Bar of a given Court, as formulated in Canons of Ethics promulgated by the organized legal profession, and the right of the Press to criticise, condemn and even castigate all public officials including Judges, since that seems to be the accepted way of advancing the cause of democratic institutions.

It is by no means a welcome task which confronts the Court in this proceeding; the well-known propensity of lawyers to speak their minds freely with respect to

judicial conduct which they believe to be erroneous (proverbially a tavern relaxation) probably cannot be successfully hampered by self-imposed regulations such as the Canons, or by the rules of a Court adopted in the hope of preserving a fair degree of professional decorum in connection with the transaction of the Court's business. However, there is at stake more than a sense of injury on the part of any individual who has been unfairly and falsely assailed in the conduct of his official duties; that is a necessary incident of the judicial office and may even be expected on the part of a disappointed litigant. Such conduct as this record reveals on the part of a lawyer, however, so far transcends the right of fair comment as to confront us with the necessity of either taking corrective action, or confessing that the Court lacks both the character and the capacity to administer its own rules.

This respondent has been twice disciplined, once by this Court, in 1941, for misconduct in reference to contingent fees, see 43 F.Supp. 106, and once in 1932 by the Court of Customs and Patent Appeals, see 20 C.C.P.A., Customs, 124, for misconduct which is described in some detail in the opinion there reported, wherein his petition for reinstatement as an attorney was denied.

In disposing of this proceeding, we have not been unmindful of the fact that the report of the Referee awards to the respondent the amount that he asserted to be payable to him, nor that he has been called upon to pay a share of the cost of the reference. That may explain his causeless resentment at the Judge who ordered it, but it does not excuse his misconduct as an attorney of this Court, as revealed in this record.

Upon the proceedings and letters in the case of Cathey v. The Bethlehem Steel Company, we find and decide that the respondent Jules Chopak has been guilty of unprofessional conduct and has offended against the relevant Canons of Ethics of the New York State Bar Association, both in violation of the applicable rule of this Court.

We direct that he be suspended from practice for the period of three years, and that an order to that effect be entered within a convenient time, which shall contain a provision that at the expiration of the said period, if the respondent is able to demonstrate that he has completely respected the terms of the order, and has been and is then a person of good moral character, he may apply for reinstatement as an attorney.