IN RE ACCUSATION AGAINST ATTY. GENE W. GLENN.

GENE W. GLENN, appellant; COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF IOWA STATE BAR ASSOCIATION and NED WILLIS, appellees and cross-appellants.

No. 51457.

(Reported in 130 N.W.2d 672)

1234

OCTOBER 20, 1964.

Frank J. Karpan, of Albia, for appellant.

D. J. Fairgrave and Kent M. Forney, both of Des Moines, for appellees and cross-appellants.

THOMPSON, J.—This appeal involves conviction of the defendant of three charges of professional misconduct, in viola-

tion of chapter 610 of the 1962 Code of Iowa, and of the Canons of Professional Ethics. The charges were filed by the Committee on Professional Ethics and Misconduct of the Iowa State Bar Association, and were heard by a court composed of three district court judges as provided by section 610.30. The defendant filed an answer denying the charges and setting up some affirmative defenses. Other charges were included in the complaint, but these were dismissed by the court. So we have before us only the three of which the accused was found guilty and so are involved in his appeal. The judgment of the trial court was that the accused be suspended from the practice of law for one year. The accuser also appeals, contending the judgment erred in the matter of leniency, and that the accused should have been disbarred.

The accused was a practicing lawyer in Ottumwa. The controversy which resulted in his claimed misconduct started with a police raid on a nightclub known as "Woody's Riverside Boat and Dinner Club" in Ottumwa, about 2 a.m. on Sunday, December 16, 1962. The proprietors were William J. and Helen E. Woodrow. As a result of the police action the owners were arrested on bootlegging charges, an employee was charged with illegal sale of liquor, and some 79 patrons were charged with frequenting a disorderly house where liquor was sold, in violation of an Ottumwa city ordinance. All parties posted bonds. Two attorneys were retained by the club owners to represent the patrons as well as themselves.

There were a number of conferences. Seized liquors were ordered held, and the city council revoked the Class "B" club beer permit of the proprietors. The customers who had posted bonds were advised to forfeit them; but at this time the attorneys retained by the club owners also told the defendant patrons they could no longer represent them. Most of the patrons followed the suggestion and permitted the forfeiture of their bonds, and no further action was taken as to them, with some exceptions which will be referred to later.

It appears that after some conferences, a "settlement" of the entire matter, again with two exceptions of parties who had

not elected to permit the forfeiture of their bonds, but had determined to plead not guilty, was worked out. This agreement seems to have been put into writing, but never signed. However, its essential details were followed. It does little credit to those who participated in it, but so far as the charges against the accused are concerned it has no materiality. It does not excuse the conduct of the defendant. It provided for dismissal of the state charges against the Woodrows and their employee, for the return of the seized liquor, the reinstatement of the revoked beer permit, and the forfeiture of bonds filed by the Woodrows on certain city ordinance charges against them. They agreed not to appear when these cases were set for trial.

As to the patrons, they were to be advised the attorneys retained for them by the Woodrows would no longer represent them, and they could if they saw fit employ counsel of their own choosing and appear and defend at their own expense. If they did not so elect, their bonds in the amount of $19 each would be forfeited, and that would be a final disposition of the cases against them. Two patrons, Betty Wauneta Francis and Dick Dee Clawson, elected to plead "Not Guilty", and retained the defendant Glenn to represent them. They were eventually tried in the Ottumwa Municipal Court and found guilty, and appealed, or attempted to appeal, to the district court. Further facts will be stated in following divisions of this opinion.

I. The first charge against the accused which was sustained by the trial court is that he caused to be printed and distributed in Ottumwa a leaflet attacking Municipal Judge Willard E. Dullard, in violation of section 610.14(1) of the Code of Iowa and of Canon 1 of the Canons of Professional Ethics of the American Bar Association. These canons have been adopted by the Iowa Supreme Court and made a part of its court rules; see Supreme Court Rule 119.

We regard this charge as extremely grave. The trial court found that in May of 1963 the accused caused this leaflet to be printed and circulated in Ottumwa. While these appeals are heard by us de novo, In re Disbarment of Meldrum, 243 Iowa 777, 781, 51 N.W.2d 881, 883, we follow the usual rule of giving weight to the fact findings of the trial court. Indeed,

the connection of the accused with this publication is overwhelmingly proven, and he did not see fit to take the stand to deny it. There is substantial and wholly believable evidence that the accused went to a printing shop in Pleasantville, some 55 miles from Ottumwa, and ordered the printing of the leaflet; and that he was responsible for its distribution in Ottumwa. Because of the importance of the publication, we set it out in full herewith.

"Justice ? ? ? In Ottumwa

"They say that Justice is blind, but it took Municipal Judge Willard Dullard to prove that it is also DEAF and DUMB!

"A courtroom full of spectators heard the appeal taken, January 30 in the Clawson and Francis trials. The Ottumwa Courier carried this report the 31st:

'Following the judge's decision and statement, Atty. Gene W. Glenn announced an appeal from the sentences to the District Court. Bond in each case was then set at $250.'

"Bonds for both defendants were approved by the Clerk of Municipal Court the same day. One carried the entry that 'the defendant has appealed from the judgment of Willard E. Dullard, Judge.' Who authorized these bonds?

"Now the judge says no appeal was made. Quite coincidentally, this comes at a time when the cases are called up in District Court for trial anew. Is the judge afraid that these people might have a fair trial before a jury?

"Was Judge Dullard ordered to prevent an appeal? Is it the same group of city and county officials who ordered him to forfeit the bonds of 75 people without trial, back on January 10th?

"Our constitution provides for due process of law and trial by jury. What state of affairs have we come to when the Overlords of Ottumwa can make a mockery of these fundamentals?

"The stink gets more overpowering each day. Many citizens are beginning to wonder what Really lies behind the Boathouse 'deal,' and what our officials are trying desperately to cover up.

"Isn't it time that the true facts come out and the whole rotten mess cleaned up? So long as our town is under the con-

trolling influence of men who deny the U. S. Constitution there will be no justice in Ottumwa.

## "Who Will Lead The Way?"

The accused asserts that he was within his right of free speech, and that it was his right to criticize the court, and to speak fully regarding judicial acts and conduct. We disagree. The true rule we think is enunciated in In re Chopak, 66 F. Supp. 265, 271. There it is said: "However, there is at stake more than a sense of injury on the part of any individual who has been unfairly and falsely assailed in the conduct of his official duties; that is a necessary incident of the judicial office and may even be expected on the part of a disappointed litigant. Such conduct as this record reveals on the part of a lawyer, however, so far transcends the right of fair comment as to confront us with the necessity of either taking corrective action, or confessing that the Court lacks both the character and the capacity to administer its own rules."

It is evident that the accused went beyond the limits of fair criticism of the court. The judge is accused, not only of judicial error, not only of being mistaken in his recollection of facts, but of being so prejudiced and corrupt that he wished to deny the litigants a fair trial on appeal, and, still more, of being subject to control "of the same group of city and county officials who ordered him to forfeit the bonds of 75 people without trial, back on January 10." The accused does not contend that he had proof, other than his own unsupported suspicions, that certain officials controlled the judicial acts of Judge Dullard and that he was acting under their orders.

Code section 610.14(1), supra, is quoted: "It is the duty of an attorney and counselor: 1. To maintain the respect due to the courts of justice and judicial officers." Canon 1 of the Canons of Professional Ethics, supra, now a part of the rules of this court, provides: "1. *The Duty of the Lawyer to the Courts.* It is the duty of the lawyer to maintain towards the Courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the

Bar against unjust criticism and clamor. Whenever there is proper ground for serious complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities. In such cases, but not otherwise, such charges should be encouraged and the person making them should be protected."

Code section 610.24 says that among the sufficient grounds for revocation or suspension of an attorney's license to practice is: "3. A willful violation of any of the duties of an attorney or counselor as hereinbefore prescribed."

Much in point here is State Bar Commission ex rel. Williams v. Sullivan, 35 Okla. 745, 131 P. 703, L. R. A. 1915D 1218. There the accused had published a pamphlet labelled "A Criminal Combine." The Oklahoma Supreme Court there laid down this rule: "An attorney has the right to criticize the courts of this state, so long as his criticisms are made in good faith and in respectful language, and with no design to wilfully or maliciously misrepresent the position of the courts, *or tend to bring them into disrepute or lessen the respect due them.*" (Italics supplied.) Loc. cit. 35 Okla. 752, 131 P. 707. It was held that the attorney had gone beyond the limits of fair criticism, under statutes and rules much like our own.

We have no hesitancy in finding that the leaflet went much further than the accused, as a lawyer, had a right to go. He offered no evidence that Judge Dullard was ordered to prevent an appeal, or that he was under the control of any outside officials. We have no occasion to pass upon the question whether if he had been able to prove his charges the publication would have been justified; although if he had such evidence, proper ways were available to him to obtain a remedy. The entire publication evidences a desire on the part of the accused to belittle and besmirch the court and to bring it into disrepute with the general public. The trial court properly found it reprehensible, and acted accordingly.

II. The court also found that the accused had purported to represent certain parties, five in number, in filing an application to set aside the bond forfeitures which had been made in the city ordinance violation cases above referred to.

These people testified they had not retained him, and two of them, Michael K. Hansen and his wife, Janice Hansen, said they had told him when he called them that they did not want their bonds reinstated. This may have been after the reinstatement had actually taken place. All five of these witnesses testified they were satisfied with the original forfeiture of their bonds, and they had not told the accused or anyone for him that they wished him to represent them in procuring cancellation of the forfeitures. As a result of the accused's unauthorized appearance for them, and, as they say, without their knowledge, the forfeitures were set aside and new bonds ordered; and upon their failure to post them they were arrested and caused additional expense and embarrassment.

The accused meets this evidence by the testimony of one Bernard Shaw, who was one of the unfortunates caught in the web of the police raid. Shaw testified that he made up a list of those who wished their bond forfeitures set aside and gave it to the accused, and that the names of the five who claimed unauthorized representation appeared thereon. However, the accused, who conducted the examination of Mr. Shaw, brought out that he had required an affidavit from him to go with his petition asking for reinstatement of his bond. The record also shows this: "Did I tell you before I could represent these people, that affidavits would have to be prepared for them to go with their petitions asking for reinstatement, do you recall?" Objection to this question as leading was sustained; but the record as made indicates that at the time the accused wanted something more than Shaw's list before filing the applications for reinstatement. No such affidavits were secured from the Hansens and the other three witnesses for the accuser who denied authorizing representation. The trial court found the accused guilty of unauthorized claim of representation, and our study of the record causes us to agree.

Section 610.14(3) is pertinent here. We set it out:

"It is the duty of an attorney and counselor: * * *

"3. To employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never to seek to mislead the judges by any artifice or false statement of fact or law."

Section 610.24(3), quoted above, is also in point. The misconduct of an attorney who appears or files pleadings without authority is so evident as to need no citation of rules or cases; but we quote from State ex rel. Nebraska State Bar Association v. Nelson, 147 Neb. 131, 132, 22 N.W.2d 425, 426: "The filing of appearances, without the authority of the persons for whom he purports to appear, and the taking of default judgments on the strength of such appearances, operates as a fraud upon the court and the parties thus shown to have made appearances. Such conduct is very reprehensible on the part of a lawyer and requires the infliction of disciplinary penalties by this court."

III. The final charge which was sustained by the trial court concerns the attempt of the accused to file a complaint charging Judge Dullard with the criminal offense of perjury. Having prepared such a complaint, he took it to two judges of the Second District Court, asking that it be filed. They advised him to take it before the grand jury. He also went to the county attorney, who likewise advised him to appear before the grand jury. He gave a copy of the complaint to a reporter for the Ottumwa Daily Courier, but requested him to withhold publication until it was filed. Although the county attorney was willing to present the matter to the grand jury, the accused did not see fit to appear there or to urge his charge. He was entitled to do so; but his failure to accept the advice of the two district court judges and of the county attorney leads to the certain conclusion that he wanted to embarrass Judge Dullard and to obtain publicity more than he desired a bona fide presentation of the matter. A perjury charge is always difficult to maintain, and the trial court was of the opinion the evidence of such wrongdoing against Judge Dullard was very slight, if any there was. We agree; but this is material only as bearing on the accused's motives in attempting to get it filed without action by the grand jury, which would hold a secret hearing and would pass upon the evidence, before any publicity was had.

Here again Canon 1, supra, becomes material. If the accused thought there was a case of perjury maintainable against Judge Dullard, he should have been willing to accept the advice of the two able district court judges and submit it to the grand

jury. He did not try to protect the court from criticism that might well prove to be unjust; on the contrary, he attempted a course of procedure which would certainly subject the court to unfortunate publicity, no matter what the final result might be.

IV. The entire record indicates an improper desire of the accused to try his case in the news media and before the public rather than in the courts. We do not overlook his numerous attempts to obtain redress by court actions; but he appears to have believed it was proper to supplement and fortify these by public attacks on the court which went beyond the bounds of proper conduct of an attorney. The impression that he was seeking publicity is also not impossible to draw. We agree that the trial court correctly found him guilty of conduct improper in an attorney, which violated the statutes of Iowa and the Canons of Professional Ethics.

V. The accuser cross-appeals, urging that the accused's conduct was such as to require a more severe punishment. We are not bound by the judgment of the trial court, but may modify it on a proper occasion. The governing rule is set out in In re Disbarment of DeCaro, 220 Iowa 176, 184, 262 N.W. 132, 136, where we quoted with approval from 6 C. J., section 93, pages 612, 613 : "In arriving at the punishment which should be imposed, each case must be largely governed by its particular facts, and the matter rests in the sound discretion of the court."

We are disposed to hold that the trial court properly evaluated the situation in ordering the punishment of suspension from the practice of law in Iowa for one year. Some doubt arises because the attitude of the accused is clearly not one of repentance; he attempts to justify his acts. Repentance is ordinarily a commendable if not a necessary attribute for one who expects leniency. It is hoped the fact that he has escaped the extreme penalty of disbarment will not be taken by the accused as any justification for his misconduct or for similar conduct in the future.

We have concluded that the judgment of the trial court should be, and it is, affirmed on both appeals.

All JUSTICES concur except HAYS, J., not sitting.