STATE OF NEBRASKA EX REL.
NEBRASKA STATE BAR ASSOCIATION, RELATOR, v.
KENNETH LEE MICHAELIS, RESPONDENT.

316 N.W.2d 46

Filed February 12, 1982.   No. 42820.

Paul L. Douglas, Attorney General, and Mel Kammerlohr for relator.

Kenneth Lee Michaelis, pro se.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and HASTINGS, JJ.

PER CURIAM.

This is an original disciplinary proceeding brought against the respondent, Kenneth L. Michaelis, an attorney admitted to practice in this state by the State of Nebraska ex rel. Nebraska State Bar Association, the relator herein.

Following hearings held before the Committee on Inquiry of the Ninth Judicial District and The Advisory Committee, formal charges were filed against the respondent on November 29, 1978, arising out of his conduct during a 1978 campaign for the office of Cuming County attorney. The formal charges consist of four counts alleging that the respondent had violated the following Canons of Ethics and Disciplinary Rules of the Code of Professional Responsibility: Canon 1, DR 1-102(A) (1), (4), (5), and (6); DR 1-103(A); and Canon 2, DR 2-101(A). Additionally, upon the motion of the relator, four more charges were filed against the respondent relating to statements he made and his conduct during the pendency of this disciplinary pro-

ceeding. The additional charges allege that the respondent violated Canon 1, DR 1-102(A) (1), (5), and (6), and Canon 8, DR 8-102(B). In each instance it is alleged that the respondent engaged in conduct prejudicial to the administration of justice or in conduct tending to bring reproach, discredit, and disrespect upon himself, the courts, and the legal profession.

The referee appointed by this court held a hearing on the formal charges on June 30, 1980, and a hearing was held on the additional charges filed against respondent on February 24, 1981. The referee filed his report with this court on April 7, 1981, in which report he found that the respondent had violated the aforementioned disciplinary rules as set out in the charges. In his report filed in this matter with this court on April 7, 1981, the referee concludes by stating: "This Referee has been waiting for some evidence of sorrow or regret on the part of the Respondent that would give some assurance that the conduct herein disclosed will not be repeated. There have been no such expressions of regret nor has there been any retraction by the Respondent of any of the charges he has made. His conduct before this Referee in several hearings has been exemplary and it has been difficult to associate the Respondent before us as the author of the documents received in evidence. This is some basis for hope of reformation. I have in my mind touched upon the thought of recommending outright disbarment but having regard to the short time this Respondent has been engaged in practice, his youth, having regard to the economic stake he has in his period of training and education for a legal career extended over his possible lifetime, and the well being of members of his family, and remembering also that it is not the purpose by this proceeding to punish but rather to reform, I recommend that the Respondent be suspended from practice in this State for a period of one year." Respondent has filed exceptions to the report of the referee and the matter has now been argued before this court.

Before discussing the merits of the allegations con-

tained in the charges against the respondent, it will be helpful to set out established standards which govern the review by this court in disciplinary proceedings. We have held that the relator must establish the allegations in the formal charges by a clear preponderance of the evidence, so the court is satisfied to a reasonable certainty that the charges are true. *State ex rel. Nebraska State Bar Assn. v. Hollstein,* 202 Neb. 40, 274 N.W.2d 508 (1979); *State ex rel. Nebraska State Bar Assn. v. Rhodes,* 177 Neb. 650, 131 N.W.2d 118 (1964). The findings must be sustained by a higher degree of proof than that required in civil actions, yet falling short of the proof required to sustain a conviction in a criminal case. *State ex rel. Nebraska State Bar Assn. v. Hollstein, supra; State ex rel. Nebraska State Bar Assn. v. Richards,* 165 Neb. 80, 84 N.W.2d 136 (1957). In a proceeding for the disbarment of an attorney at law the presumption of innocence applies, and the charge made against him must be established by a clear preponderance of the evidence. *State ex rel. Nebraska State Bar Assn. v. Hollstein, supra; State ex rel. Nebraska State Bar Assn. v. Pinkett,* 157 Neb. 509, 60 N.W.2d 641 (1953). To determine whether and to what extent discipline should be imposed in a disbarment proceeding, it is necessary for this court to review the evidence de novo, considering the nature of the offense, the need for deterrence of others, maintenance of the reputation of the bar as a whole, protection of the public, the attitude of the offender generally, and his present or future fitness to continue in the practice of law. *State ex rel. Nebraska State Bar Assn. v. Erickson,* 204 Neb. 692, 285 N.W.2d 105 (1979); *State ex rel. Nebraska State Bar Assn. v. Cook,* 194 Neb. 364, 232 N.W.2d 120 (1975).

Turning to the formal charges originally filed against the respondent in this matter, the first such charge concerns a political advertisement placed by Michaelis in the Wisner News-Chronicle, a newspaper of general circulation in Cuming County. It appears from the evidence that Michaelis had been seeking nomination for the position of Cuming County attorney in an effort to

unseat the incumbent county attorney. According to respondent, he placed the advertisement of April 13, 1978, with the newspaper for the purpose of announcing his withdrawal from candidacy for the county attorney position. The advertisement consists of four columns of the paper, one continuing onto a second page. Only one sentence in the first column and the last paragraph of the advertisement relate to Michaelis' withdrawal from the county attorney election. The bulk of the advertisement contains allegations of illegal and unethical conduct on the part of the incumbent county attorney and several other named attorneys in the Cuming County area. The article also contains several self-laudatory statements in reference to respondent.

The second formal charge is based upon a one-page document the respondent caused to be released on or about April 11, 1978, and is captioned as a statement to the press. This paper also contains allegations of illegal and unethical conduct on the part of several local attorneys. The statements contained therein cast aspersions by innuendo on the incumbent county attorney and the city attorney of West Point, Nebraska.

The third formal charge relates to a three-page document dated April 25, 1978, and circulated by the respondent. These pages repeat many of the allegations of impropriety alleged by respondent in his other publications.

The fourth formal charge is in regard to a one-page document captioned "Acceptance of Republican Nomination for Cuming County Attorney," and is dated June 5, 1978. This document alleges conspiracy on the part of three Cuming County officials in removing respondent's name from the April primary election ballot.

During the pendency of the investigation of the formal charges, respondent made several additional statements and caused to be filed with the Cuming County Court certain documents which gave rise to the relator's motion of October 31, 1980, to incorporate additional charges against respondent. The first of these additional charges relates to a statement made by

Michaelis to a newspaper reporter on or about October 7, 1980, which subsequently appeared on the front page of the West Point News on October 9, 1980. In the article Michaelis described the disciplinary proceedings brought against him, in part, as follows: " 'The Nebraska Supreme Court is scared of this, because they know they have a dirty house, and if you have a dirty house, you don't open the windows . . . . And two attorneys have already committed perjury in this matter.' "

The second additional charge concerns a notice of disallowance of claim which the respondent caused to be filed in the county court of Cuming County, Nebraska, on September 8, 1980. The document appears to disallow all but $5.78 of a claim filed by a local law firm against the estate of one Herman A. Melcher. The document contains a typed statement prepared by the respondent, which he caused to be signed by the personal representative of the estate. The statement reads in part: "The Melcher family fear that theft by some Cuming County lawyers was imminent if it did not already occur. The family states its full confidence in the first attorney retained by [name omitted], Mr. Ken L. Michaelis, and they refuse to allow further theft from this estate by attorneys and their lust and greed."

The third additional charge pertains to a document entitled "Praecipe — Requisition for Transcript," and filed in the county court of Cuming County, Nebraska, on October 23, 1980. This document also contains derogatory claims made against area attorneys on the validity of their claims against the Melcher estate and, generally, upon the integrity of the courts and the judicial system.

The fourth, and last, additional charge filed in this case concerns a statement respondent issued on October 2, 1980, to radio station WJAG/KEXL of Norfolk, Nebraska. The statement, which concerns the disciplinary proceedings filed against respondent, was recorded and broadcast to the public, and was as follows: "Never have I said anyone was guilty of bribery. Never have I done this. This is a blatant and apparent, this is a blatant

lie. And apparently is perpetrated by the Nebraska Bar Association using and misusing the press and media. It is a typical smear campaign by what is probably in many people's mind the dirtiest profession in all of America today. Not just today, it was that way yesterday, and the day before that.

"At least prostitutes, and prostitution has a sense of fairness and some decency. The Nebraska State Bar Association apparently has none.

"Not one of the many false allegations by this very ignorant committee of puppets and professional stooges of the Nebraska Bar Association is true. No one wants to look into the factual truth, for they fear opening a can of worms that finds the West Point City Attorney guilty of gross negligence, reckless and wanten [sic] malice, greed, and gross conflicts of interest for his own personal gain and selfish glory over the past 20-years. His name is [omitted]. Some of the same is true about [name omitted], our former Cuming County Attorney . . . ."

It is clear that the foregoing statements would clearly have a profound effect upon the minds of the reading and listening public, and could only serve to shake the confidence of the public in the legal profession. While the record in this case is voluminous and obviously cannot be quoted in full in this opinion, we have read the entire record and believe that all that is necessary to be discussed at this point is the testimony of the respondent, given under oath, in his original hearing held before the Committee on Inquiry, Ninth Judicial District, on November 14, 1978. We quote pertinent parts of respondent's testimony at that hearing. During his direct testimony, the respondent was asked: "Q Mr. Michaelis, in these various exhibits, you make some general statements indicating that you have knowledge of unethical conduct on the part of attorneys in Cuming County, and also you make some allegations of what would amount to criminal conduct. Did you have any or do you now have any evidence of any such conduct on the part of any attorneys in Cuming County? A I don't think

it could be construed that we made allegations against particular attorneys. . . . Q So all of your statements of that nature were based simply on what other people had said to you, is that right? A What other people had said to me. . . ." He was also asked: "Q Then, for purposes of clarification, you know of no specific acts on the part of [name omitted] that would be in violation of the Code of Professional Responsibility — A No, no clear ones. No. Q — or the Nebraska statutes? A Or the Nebraska statutes. None that readily come to my mind. Q Another individual who has been mentioned specifically, [name omitted] — do you know of any specific conduct on his part that would be a violation of the Code or of any Nebraska Statutes? A Not clearly; not that I would clearly believe to be in violation. . . . Q Again, you know of no such conduct on the part of [name omitted]? A I'm not very knowledgeable of his affairs. Q You've made several allegations in regard to [name omitted], specific allegations. In connection with the salary increase, you stated, in Exhibit 1, 'smacks as a species of blackmail and bribery'. Do you know of any 'blackmail' or 'bribery' that [name omitted] was involved in? A No."

The respondent also responded to questions put to him at that hearing as follows: "Q Have you, or anyone on your behalf, made any complaints to this committee about unethical conduct of a lawyer in Cuming County or any other county in this district? A No, I have not. Q Did you ever complain to the Counsel for Discipline or any representative of the Bar Association? A No, I have not. Q Didn't you, in some of your correspondence, indicate that your letters to the pastors, with regard to making a donation to their church, was a mistake? A Was a mistake? Q Yeah. A On my part? Q Yes. A I don't believe. I don't remember. I don't recall."

Finally, the respondent was asked: "Q Mr. Gushard [Counsel for Discipline] has asked you about various attorneys. Do you have any evidence of dishonesty or unethical acts on the part of [name omitted]? A Just other than hearsay that mainly [name omitted] had

made reference about. Q Other than the attorneys that have been mentioned, do you have any evidence of dishonesty or unethical conduct on the part of any other attorneys in Cuming County or in this district? A Other than the ones that — Certainly, I have heard of the ones that have been disbarred, as far as that is concerned."

Respondent was also asked with reference to a letter written to St. Joseph's Catholic Church in Wisner, in which letter he stated that if he should become county attorney he planned to divide a portion of the salary to the various parishes. He was asked: "Q . . . Do you see an ethical problem with such an offer as that? A Well, now that it has been brought on up, I do see; but at the time, that's the way one honestly felt, you know. Now, it could be construed as a ethical problem. Q At this time, do you see that it is an ethical problem? A Certainly."

In his report the referee found that the respondent had prepared the above-mentioned materials and that he had placed many of them in the region's newspapers or for broadcast by radio. The referee determined that Michaelis knew that many of the statements were false, deceptive or misleading, or that with ordinary care he should have known them to be false. The referee also found that Michaelis never brought the alleged acts of impropriety to the attention of the proper authorities, but that he consistently used the news media to make public denunciations of certain local attorneys and build up his own image by contrast. The lack of specifics in respondent's allegations, as well as the lack of any reasonable proof of his claims, suggests a malicious motive on the part of respondent, rather than a good faith attempt at fair and candid criticism.

Neb. Rev. Stat. § 7-105 (Reissue 1977) provides that upon admission to the bar of this state, attorneys assume certain duties as officers of the court. Among the duties imposed upon attorneys is the duty to maintain the respect due to the courts of justice and to other judicial officers. This court has recognized and adopted the principles embodied in the American Bar Association's Code of Professional Responsibility as a general state-

ment of the standards of professional conduct required of a member of the Nebraska State Bar Association. Canon 1 of the code pertains to maintaining the integrity and competence of the legal profession. DR 1-102, promulgated thereunder, prohibits, among other things, engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; engaging in conduct prejudicial to the administration of justice; or any other conduct adversely reflecting on the fitness of a lawyer to practice law. DR 1-103 further provides that any lawyer possessing unprivileged information of a violation of the code shall report such knowledge to the proper tribunal or other authority empowered to investigate or act upon the conduct of lawyers and judges.

DR 2-101 also provides that a lawyer shall not prepare, or cause to be prepared, any form of public communication which contains professionally self-laudatory statements. Also pertinent to this matter is Canon 8, which states that a lawyer should assist in improving the legal system. DR 8-102(B) provides that a lawyer shall not knowingly make false accusations against a judge or other adjudicatory officer. The rationale for this disciplinary rule appears in Ethical Consideration 8-6, which provides in pertinent part: "Adjudicatory officials, not being wholly free to defend themselves, are entitled to receive the support of the bar against unjust criticism. *While a lawyer as a citizen has a right to criticize such officials publicly, he should be certain of the merit of his complaint, use appropriate language, and avoid petty criticisms,* for unrestrained and intemperate statements tend to lessen public confidence in our legal system. *Criticisms motivated by reasons other than a desire to improve the legal system are not justified.*" (Emphasis supplied.)

As a defense to the charges listed above, the respondent makes the following contentions: (1) That the statements attributed to him during the 1978 county attorney election were campaign rhetoric made during the heat and stress of a political campaign; (2) That to bring disciplinary proceedings against him for his ex-

pressions is an unconstitutional restraint upon his first amendment right to free speech; (3) That he acted in his capacity as a citizen and not as an attorney of record for a pending trial at the time the statements were made; and (4) That his comments and criticisms in this regard were made in good faith with the purpose of improving the legal system.

The respondent's assertion that he cannot be disciplined for his comments because they were protected expressions under the first amendment is an issue raised for the first time before this court. This issue requires a delicate balancing of the interests in upholding the integrity of our judicial system and in protecting the right of an attorney to free expression. In determining this balance, we will rely primarily upon the case law as formulated by other jurisdictions which have addressed this issue.

The U.S. Supreme Court addressed this issue generally in the case of *In Re Sawyer*, 360 U.S. 622, 79 S. Ct. 1376, 3 L. Ed. 2d 1473 (1959). In a five to four decision the Court held that the conduct of Sawyer, an attorney practicing in Hawaii, during a public speech did not impugn upon the integrity of a judge during a current Smith Act trial. The Court found that the lawyer's comments about the "shocking and horrible things that go on at the trial in a Smith Act case" were proper criticism of the law itself and the government's prosecutorial policy, and not personal criticism aimed toward the trial judge. In reviewing the case the Court began its discussion "with the proposition that lawyers are free to criticize the state of the law." *Id.* at 631. The Court went on to state: "To say that 'the law is a ass, a idiot' is not to impugn the character of those who must administer it. To say that prosecutors are corrupt is not to impugn the character of judges who might be unaware of it . . . ." *Id.* at 634. The Court also stated that a lawyer can properly criticize a judge's view of the law, as follows: "If [the judge] was said to be wrong on his law, it is no matter; appellate courts and law reviews say that of judges daily, and it impugns no dis-

grace. Dissenting opinions in our reports are apt to make petitioner's speech look like tame stuff indeed. *Petitioner did not say [the judge] was corrupt or venal or stupid or incompetent.* The public attribution of honest error to the judiciary is no cause for professional discipline in this country." (Emphasis supplied.) *Id.* at 635.

The Court also noted that "surely permissible criticism may as well be made to a lay audience as to a professional . . . ." *Id.* at 632. Finally, the Court noted: "A lawyer does not acquire any license to do these things by not being presently engaged in a case. *They are equally serious whether he currently is engaged in litigation before the judge or not.* We can conceive no ground whereby the pendency of litigation might be thought to make an attorney's out-of-court remarks more censurable, other than that they might tend to obstruct the administration of justice." (Emphasis supplied.) *Id.* at 636.

It is implicit in the statements of the Court as to the boundary of permissible criticism of the law and judiciary that instances can exist where an attorney's criticism or conduct would be impermissible and the subject of professional discipline. We note, as did the Supreme Court of Kentucky in *Kentucky Bar Ass'n v. Heleringer*, 602 S.W.2d 165 (Ky. 1980), and the Iowa Supreme Court in *Matter of·Frerichs*, 238 N.W.2d 764 (Iowa 1976), that Justice Stewart was speaking for five members of the court when he stated in his concurring opinion: "If, as suggested by my Brother Frankfurter, there runs through the principal opinion an intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from even-handed discipline for proven unethical conduct, it is an intimation in which I do not join. A lawyer belongs to a profession with inherited standards of propriety and honor, which experience has shown necessary in a calling dedicated to the accomplishment of justice. He who would follow that calling must conform to those standards.

*"Obedience to ethical precepts may require abstention from what in other circumstances might be constitu-*

*tionally protected speech.*" (Emphasis supplied.) 360 U.S. at 646-47.

Generally, the majority of the state courts which have addressed this issue concur that a person does not surrender his freedom of expression upon becoming an attorney. However, most jurisdictions have recognized that upon admission to the bar an attorney incurs the obligation to temper his criticism of the bench and bar in the manner allowed by the canons of professional ethics. As stated by the Kentucky Supreme Court in *Kentucky Bar Ass'n v. Heleringer, supra* at 168: "We are not alone in our opinion that by coming to the bar an attorney incurs the ethical obligation not to bring the bench and bar into disrepute by unfounded public criticism. 'Our system of justice rests upon the mutual regard of the bench and bar.' *Matter of Frerichs,* supra at 766. '[I]n the case of a lawyer an abuse of the right of free speech may be some index of his character or fitness to be a lawyer.' *In Re Lacey,* S.D., 283 N.W.2d 250, 252 (1979), *quoting In Re Gorsuch,* 76 S.D. 191, 75 N.W.2d 644, 57 A.L.R.2d 1355 (1956). 'Nor does free speech give a lawyer the right to openly denigrate the court in the eyes of the public.' *In Re Raggio,* 87 Nev. 369, 371, 487 P.2d 499, 500 (1971). *See also, In Re Glenn,* 256 Iowa 1233, 130 N.W.2d 672, 12 A.L.R.3d 1398 (1964); ABA Code of Professional Responsibility, EC 8-6; Annot., 12 A.L.R.3d 1408; Annot., 56 L. Ed. 2d 841, 855-69. *But see, Justices of the Appellate Division v. Erdmann,* 33 N.Y.2d 559, 347 N.Y.S.2d 441, 301 N.E.2d 426 (1973); *State Bar v. Semaan,* Tex. Civ. App., 508 S.W.2d 429 (1974); *Polk v. State Bar of Texas,* N.D. Tex., 374 F. Supp. 784 (1974)."

In the case of *Matter of Frerichs, supra* at 769, the Iowa Supreme Court stated: "A lawyer, acting in a professional capacity, may have some fewer rights of free speech than would a private citizen. As was well explained in *In re Woodward,* 300 S.W.2d 385, 393-394 (Mo. 1957):

'* * * Neither the right of free speech nor the right to

engage in "political" activities can be so construed or extended as to permit any such liberties to a member of the bar; respondent's action was in express and exact contradiction of his duties as a lawyer. A layman may, perhaps, pursue his theories of free speech or political activities until he runs afoul of the penalties of libel or slander, or into some infraction of our statutory law. *A member of the bar can, and will, be stopped at the point where he infringes our Canons of Ethics;* and if he wishes to remain a member of the bar he will conduct himself in accordance therewith. * * *'" (Emphasis supplied.)

In the recent case of *State v. Russell*, 227 Kan. 897, 610 P.2d 1122 (1980), the Kansas Supreme Court determined that an attorney could be disciplined for intentionally publishing known falsehoods while engaged in a campaign for public office. In addressing the first amendment free expression issue, the court stated at 901-02, 610 P.2d at 1127: "Respondent notes that little authority can be found on the issue of professional discipline for political rhetoric directly implicating dishonesty under DR 1-102(A) (4). However, extensive treatment is afforded the issues of discipline of attorneys for publications made in the course of political campaigns for the election of judges. See annotations in 57 A.L.R.2d 1362 and 12 A.L.R.3d 1408. *An attorney may be disciplined for criticism in the heat of a political contest if such criticism is carried beyond the limits of truth and fairness. In re Charles A. Thatcher*, 80 Ohio St. 492, 89 N.E. 39 (1909). Within that context the expression of opinion is protected if true or in good faith believed to be true, but when derogatory factual allegations are false and with ordinary care should have been known to be false, discipline may be imposed. *State Board of Exam. v. Spriggs*, 61 Wyo. 70, 155 P.2d 285 (1945).

"In *State v. Nelson*, 210 Kan. 637, 640, 504 P.2d 211 (1972), this court stated: 'Concerning respondent's argument that DR 1-102(A) (5) creates an impermissible

and chilling effect on "First Amendment freedoms," an examination of decisions on the point (12 A.L.R.3d, Anno., p. 1408) reveals the consensus to be that an attorney's right to free speech is tempered by his obligation to both the courts and the bar . . . .'

"In the case of *In re Baker*, 218 Kan. 209, 542 P.2d 701 (1975), a disciplinary proceeding arising out of a political campaign against an incumbent judge, this court held that *a challenger in a partisan election for judicial office is free to criticize an incumbent's record so long as the criticism is accurate.* However, a violation of ethics was found and the challenger was censured for publishing untrue statements concerning eligibility for a disability pension, which statements the challenger knew or could have known were false by reading an applicable state statute.

"Although a lawyer may speak out and state his opinions on current campaign issues without fear of jeopardizing his license to practice law, his First Amendment rights are not absolute. The guarantee of freedom of speech will not protect him from disciplinary action as a lawyer if he is guilty of known falsehood intentionally used and published for the purpose of misleading the voters and gaining personal advantage for himself or his candidate." (Emphasis supplied.)

We determine, as did the referee, that respondent's public attribution of unethical and illegal conduct on the part of the then incumbent Cuming County attorney and other named regional attorneys, charges respondent knew or should have known to be unwarranted, was unethical and unprofessional conduct tending to bring the bench and bar of this state into disrepute and tending to undermine the public confidence in the integrity of the judicial process. If respondent had reason to believe, in good faith, that the named individuals engaged in proscribed conduct, then he had the responsibility and obligation of notifying the office of the Counsel for Discipline of the Nebraska State Bar Association as provided in rule 8(A) of the

rules of this court.

Respondent has suggested that because he was not acting in his capacity as an attorney of record for a pending trial, the Code of Professional Responsibility should not apply to his conduct. We do not agree. This court has stated on several prior occasions that an attorney may be subjected to disciplinary action for conduct outside the practice of law or the representation of clients. *State ex rel. Nebraska State Bar Assn. v. Ledwith*, 197 Neb. 572, 250 N.W.2d 230 (1977); *State ex rel. Nebraska State Bar Assn. v. Bremers*, 200 Neb. 481, 264 N.W.2d 194 (1978); *State ex rel. Nebraska State Bar Association v. Walsh*, 206 Neb. 737, 294 N.W.2d 873 (1980). In this regard, we also note that Formal Opinion 336, Committee on Ethics and Professional Responsibility of the American Bar Association, dated June 3, 1974, holds that a lawyer is bound by the Code of Professional Responsibility in every capacity in which the lawyer acts, whether he is acting as an attorney or not. See, also, *Wright v. State ex rel. State Real Estate Comm.*, 208 Neb. 467, 304 N.W.2d 39 (1981).

We conclude that in the political advertisement dated April 13, 1978, as well as in the subsequent documents dated April 11, 1978, April 25, 1978, and June 5, 1978, the respondent listed several factual charges of misconduct, illegal acts, and other violations of law by the then incumbent Cuming County attorney, various Cuming County officials, the city attorney of West Point, Nebraska, and several named attorneys practicing in the region which he knew or should have known with ordinary care to be false. Such conduct on the part of respondent was unprofessional and in violation of DR 1-102(A) (1), (4), (5), and (6). The respondent's statements also included several contrasting self-laudatory statements in which he criticized not only particular attorneys but the profession as a whole, and then built up his own image for truth and veracity. These statements, which may have been made for the purpose of attracting voters to his campaign, or,

potentially, clients to his legal practice, were in violation of DR 2-101(A). We would distinguish respondent's statements, however, from the general political rhetoric of election campaigns in that they were not made fairly or accurately upon the facts, and contained false representations. Other statements made by the respondent, while not in good taste, appear to be rhetoric so general in nature and apparently aimed at protesting the state of the law that they cannot be the basis for discipline under the holding of *In Re Sawyer*, 360 U.S. 622, 79 S. Ct. 1376, 3 L. Ed. 2d 1473 (1959).

We now consider the proper discipline to be imposed upon respondent in this case. Although it is true that the referee in his report recommended that the respondent be suspended from the practice of law in this state for a period of 1 year, he also noted that respondent had not displayed any evidence of remorse or sorrow with regard to his conduct, or any assurances that it would not be repeated in the future. It should be noted that the original proceedings in this matter were commenced in 1978, and this matter is now being adjudicated in 1982, or approximately 4 years later. Apparently the respondent has failed or refused to profit from past experience and still is convinced that his past conduct was perfectly proper and ethical, and that he should not be penalized for his actions. We note with dismay that on January 14, 1982, after the submission of the case to this court for decision, he filed in the office of the Clerk of the Supreme Court two documents in which he continues to vilify certain attorneys, the bar generally, and the Nebraska Supreme Court. The first document, dated November 8, 1981, is entitled "RE: Attorney General's Office LIES to Nebraska Supreme Court." The document in question is too long to be included in full in this opinion, but we quote from certain pertinent excerpts thereof. In one paragraph he attacks the Attorney General and the assistant attorney general in this case, stating: "[Name omitted] and [name omitted] intentionally, and with criminal

intent as in Watergate, engaged in a most blatant, easily perceivable, and massive coverup that puts Watergate, Richard Nixon, Abscam, and other government scandals to shame.

"In 1978, 1979, 1980, and 1981, Attorney Michaelis informed these corrupt State lawyers of each of the following." Thereafter, respondent repeats many of the same allegations and charges against various attorneys that were previously the basis of the action. He also alleges that the Nebraska Supreme Court refused to accept copies of his reply brief which we note was tendered in violation of the court rules with reference to its preparation. He also states in his memorandum as follows: "Why worry about organized crime in gambling, slot machines, horse racing, etc. when we have organized crime in the law itself? In the legal profession under the guise of the Nebraska Bar Association!!!"

The second document filed in this court on January 14, 1982, is dated December 15, 1981, and is entitled "NOTICE — CUMING COUNTIANS." After referring to the Nebraska Supreme Court, respondent states: "Knowing the past and the politics by a few evil, greedy, corrupt and conniving local and regional lawyers, we do not have faith in that Court's ability to be fully honest, intelligent, unbiased, truthful, and competent. The people own that Court — they can dissolve that court!"

While respondent's acts subsequent to submission should not, perhaps, be considered in determining whether he has violated the Canons of Professional Responsibility, particularly DR 8-102(B), we believe it is perfectly proper to consider these subsequent events in determining what sanctions should be applied against him in this matter. Respondent has exhibited no remorse, change in attitude, or desire to cease his scurrilous attacks upon the bar and bench of this state. We are therefore of the opinion that the original recommendation of the referee of suspension is far too lenient and, if applied, would depreciate the seriousness

of his actions. His conduct clearly demonstrates that he is not fit to engage in the practice of law in this state and should be disbarred.

JUDGMENT OF DISBARMENT.

WHITE, J., not participating.