[No. J.D. 4.   En Banc.   July 15, 1988.]

*In the Matter of the Disciplinary Proceeding
Against* JAMES C. KAISER, *Judge of
Northeast District, Redmond.*

*Riddell, Williams, Bullitt & Walkinshaw,* by *David D. Hoff, Karen F. Jones,* and *Ira S. Rubinstein,* for Commission on Judicial Conduct.

*Robert Earl Smith,* for the Judge.

DORE, J.—We hold that campaign statements made by District Judge James C. Kaiser violate Canons 1, 2(A) and 7 of the Code of Judicial Conduct. Those Canons require a judge to uphold the integrity of the judiciary, prohibit statements of party affiliation and prohibit pledges or promises of politically favored treatment. We censure Judge Kaiser.

## FACTS

In 1986, Judge Kaiser of the Northeast District Court in King County faced an especially strong challenge from William Roarty, a Seattle city attorney primarily handling driving while intoxicated (DWI) prosecutions. Judge Kaiser lost the primary vote to Roarty by a significant margin. As he prepared his campaign to save his seat, Judge Kaiser discovered that Roarty had successfully capitalized on his experience in DWI enforcement to create the impression

that he would improve DWI enforcement as district judge.[1]

Judge Kaiser considered himself an especially strict judge in DWI cases. In fact, he was at one time a member of the organization Mothers Against Drunk Drivers (MADD). In 1983 Judge Kaiser was admonished by the Judicial Qualifications Commission when it held that his membership in MADD violated Canon 5(B) of the Code of Judicial Conduct. Canon 5(B) prohibits involvement in civic organizations that are concerned with matters that may come before a judge and which might reflect adversely on a judge's impartiality.

Judge Kaiser also discovered that some of Roarty's financial backing came from attorneys who emphasized DWI defense in their practice. It appears that there was an organized effort by some of these attorneys to support Roarty. For example, one testified that he contacted numerous attorneys at the East King County Bar Association golf tournament in September 1986, seeking their support for Roarty. These were attorneys who were likely to appear before Judge Kaiser in defending DWI defendants.

In addition, Roarty had sought and received the endorsement of the Democratic Party. Judge Kaiser also had been contacted concerning that endorsement. He declined to be interviewed, however, because he believed that such an endorsement was inconsistent with the nonpartisan nature of the election.

The Democratic endorsement was a significant factor in this race. The returns from the primary election, which Roarty won, show that Democratic voters significantly outnumber Republicans in northeast King County.

To counter the Democratic Party's endorsement of Roarty, Judge Kaiser's campaign sent a letter, which he

---

[1]While we have no jurisdiction over Mr. Roarty in this proceeding, we note that Canon 7 applies equally to judges and any "candidate for election to judicial office." Canon 7(A)(1). We assume that the state bar association would have thoroughly investigated any complaint lodged against Mr. Roarty for election violations, if any.

read and approved, to Democratic precinct committee chairpersons. The letter contained the following paragraph:

Bearing in mind the nonpartisan position a judge must maintain while on the bench, it may be useful for you to know that Judge Kaiser's family have been lifelong Democrats. Indeed, Judge Kaiser has doorbelled for Democrats in the past. Although he is precluded by law from participating in partisan politics, his opponent has not been under this restriction and therefore may have provided you with a better opportunity to know him.

Commission exhibit 1(E). In order to counter Roarty's campaign on the DWI issue, Judge Kaiser made the following campaign statements:

Kaiser is "Toughest On Drunk Driving. . . ." "Judge Kaiser's opponent, Will Roarty, receives the majority of his financial contributions from drunk driving defense attorneys. These lawyers do not want a tough, no–nonsense judge like Judge Kaiser."

Commission exhibit 1(A).

"Will Roarty is supported by D.W.I. defense attorneys— there must be a reason."

Commission exhibit 1(B).

Judge Kaiser is tough on drunk driving. . . Will Roarty, the opponent, receives the majority of his financial support from drunk driving defense attorneys, whose primary interests are getting their clients off.

Commission exhibit 1(C)(1).

My opponent, Will Roarty, has received the majority of his financial contributions from drunk driving defense attorneys. This is the only group involved with Northeast District Court not supporting my re–election.

The point is clear, I am a tough, no–nonsense judge and this group of attorneys wants to prevent my re-election."

Commission exhibit 1(D).

The Commission served a complaint on Judge Kaiser in March 1987. A hearing was held before the Special Master in May 1987. He concluded that Judge Kaiser's campaign statements violated Canons 1, 2(A) and 7 of the Code of Judicial Conduct. The Commission unanimously held there

was clear, cogent and convincing evidence to support the Special Master's conclusions, and recommended that Judge Kaiser be censured. The case was then certified to this court.

We consider several issues, including: (a) the standard of review to be applied by this court; (b) whether any of Judge Kaiser's statements violate the Code of Judicial Conduct; (c) whether Judge Kaiser's statements are protected by the free speech guaranties of the state and federal constitutions; and (d) in the event we find a code violation, the proper sanction for this case.

### THE STANDARD OF REVIEW

The power to discipline a judge is conferred by amendment 71 of the State's constitution on the Supreme Court alone. Const. art. 4, § 31. The court cannot delegate its fact–finding responsibility and de novo review of disciplinary proceedings is required by this court. *In re Deming,* 108 Wn.2d 82, 88, 736 P.2d 639 (1987). However, the court gives "considerable weight" to the findings and recommendation of the Commission. *In re Buchanan,* 100 Wn.2d 396, 400, 669 P.2d 1248 (1983). The standard of proof is "clear, cogent and convincing evidence." *Deming,* at 109.

### JUDGE KAISER MADE AN IMPROPER STATEMENT OF PARTY AFFILIATION

Judge Kaiser's statement that his family were lifelong Democrats and that he himself had doorbelled for Democrats in the past violated CJC Canon 7(A)(2).

Canon 7(A)(2) provides in part:

The judge or candidate shall not identify himself as a member of a political party . . .

The clear import of the Kaiser letter is that Judge Kaiser is a member of the Democratic Party. Judge Kaiser testified that he intended the letter to counteract Roarty's endorsement by the Democrats. He stated that he wished to soften the implication that since Roarty was the Democrats' candidate, that he, Kaiser, must be a Republican.

It is true that the letter is phrased so as to avoid a direct identification of the Judge as a Democrat and that it mentions the restrictions on him regarding statements of party affiliation. Despite the phrasing and the disclaimers, however, the letter has one unmistakable message. Indeed, the disclaimers explain the phrasing away, leaving the clear implication that Judge Kaiser is himself a Democrat. We hold that Canon 7(A)(2)'s prohibition on statements of party affiliation has been violated.

### Judge Kaiser Improperly Pledged Favored Treatment

Judge Kaiser's statements to the effect that he is "tough on drunk driving" violate Canon 7(B)(1)(c), which provides in part:

(1) A candidate, including an incumbent judge . . .

. . . .

(c) should not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office [or] announce his views on disputed legal or political issues . . .

■ Judge Kaiser's statements that he is "toughest on drunk driving," and "tough on drunk driving," single out a special class of defendants and suggest that these DWI defendants' cases will be held to a higher standard when tried before Judge Kaiser. It is not clear whether this higher standard would be imposed only at sentencing or whether Judge Kaiser might somehow apply a reduced burden of proof. On the whole these statements promise exactly the opposite of "impartial performance of the duties of the office". Canon 7(B)(1)(c).

The statements regarding DWI defendants are indistinguishable from the promise of a judge to give favorable treatment to United Mine Workers who might appear before him. The Kentucky Judicial Commission on Retired and Removed Judges found that such a pledge violates Canon 7(B)(1)(c) in In re Ehlschide (order dated April 9, 1982). The ABA has recommended that the phrase "[a]

strict sentencing philosophy" should be considered a violation of that Canon. ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1444 (1980). Judge Kaiser's pledge to be tough on drunk driving goes beyond that less specific pledge. Canon 7(B)(1)(c)'s prohibition on pledges or promises of partiality has been violated.

In contrast, Judge Kaiser's statements that he is a "tough, no–nonsense judge" are pledges or promises of the permissible kind. They suggest nothing more than a strict application of the law and do not single out any particular party for special treatment. Such statements do not violate Canon 7(B)(1)(c).

### JUDGE KAISER'S STATEMENTS REGARDING THE MOTIVES OF "DWI DEFENSE ATTORNEYS" IMPUGN THE INTEGRITY OF THE JUDICIARY

The statement made by Judge Kaiser that DWI defense attorneys supported Will Roarty because their "primary interests are getting their clients off," and other statements with a similar import violate Canons 1, 2(A) and 7(B)(1)(a) of the CJC. The statements suggest, among other things, that justice is for sale and that certain defendants are not entitled to a fair trial. Such statements are improper in a judicial campaign.

Canon 1 provides:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this code should be construed and applied to further that objective.

Canon 2(A) provides:

A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Canon 7(B)(1)(a) provides in part:

A candidate, including an incumbent judge . . .

(a) should maintain the dignity appropriate to judicial office . . .

Judge Kaiser's statements regarding contributions made by DWI defense attorneys violate these Canons by calling into question the integrity and impartiality of the judiciary. Judge Kaiser suggested that, if elected, Roarty would not fairly and impartially apply the law to DWI defendants. He suggested that certain attorneys could and did buy favorable treatment for their clients, a class of defendants for whom there is little public sympathy. He suggested that there is something improper about attorneys contributing to a judicial campaign, when, of course, such contributions are entirely proper.

A case not decided under the CJC but which involves remarkably similar facts and issues is *In re Gorsuch*, 76 S.D. 191, 75 N.W.2d 644, 57 A.L.R.2d 1355 (1956). The respondent in *Gorsuch* was a candidate for circuit judge whose opponent was general counsel for a railroad. Gorsuch published cartoons which the Supreme Court of South Dakota found to warrant a reprimand.

> In one "comic strip" the general attorney for the railroad was represented as engaged in "power politics" and exerting pressure on local attorneys for the company to work for a "former RR atty. and Lobbyist" and to contribute to his campaign fund. Two other cartoons showed railroad attorneys, insurance company attorneys, public utilities attorneys and liquor [company] attorneys engaged in "power politics" and organized and working for the election of the candidate labeled "our man." With each of these cartoons were published the accompanying statements: "One Great Issue. My local Aberdeen opponent (Milwaukee Railroad attorney and Lobbyist) has accepted hundreds of dollars in campaign funds and services from a few Aberdeen Corporation lawyers. If elected? ? ? Whose Judge would he be? ? ? No other Circuit Judge candidate has been guilty of this practice. Why are they backing my local Aberdeen opponent?"

*Gorsuch*, at 195. The similarities to Judge Kaiser's campaign are obvious, and like the South Dakota court we conclude that such statements should be condemned.

In a more recent case, the respondent in the course of campaigning against an incumbent judge stated: "'[T]he state simply doesn't get a fair trial in his court.'" The Arizona court found a violation of Canon 7(B)(1)(a) and CPR DR 1-102(A)(5) (prohibiting statements prejudicial to the administration of justice). *In re Riley,* 142 Ariz. 604, 613, 691 P.2d 695 (1984). Judge Kaiser has similarly suggested that the State would not get a fair trial in a Judge Roarty's court. We conclude that Canons 1, 2(A) and 7(B)(1)(a) have been violated.

### JUDGE KAISER'S STATEMENTS REGARDING THE SOURCES OF ROARTY'S SUPPORT ARE CONSTITUTIONALLY PROTECTED SPEECH

Judge Kaiser's statements that the majority of his opponent's support came from "drunk driving defense attorneys" violate the strict terms of Canon 7(B)(1)(d)'s prohibition on "false, misleading, or deceptive campaign advertising". However, because the statements fall within the bounds of constitutionally protected speech we find no violation.

Judge Kaiser made a number of statements to the effect that Will Roarty received "the majority of his financial contributions from drunk driving defense attorneys." Judge Kaiser based his claim on Public Disclosure Commission reports from which he identified persons he believed to be DWI defense specialists. He calculated that $4,001 of $7,944 contributed to the Roarty campaign came from such attorneys. Judge Kaiser's campaign cochairperson testified as to how "DWI defense attorneys" were identified.

> In preparation of the ad, in preparation of the literature in which we stated that the opponent received a majority of his campaign funds from DWI defense attorneys, we looked over this list, and after listing those attorneys who were known DWI defense attorneys, I called the balance of the defense attorneys' offices and asked if they would represent a person who had received a DWI.

Verbatim Report of Proceedings, at 37.

For reasons discussed below, the Commission concluded that the statements concerning Roarty's funding were false and therefore violated Canon 7(B)(1)(d), which prohibits "false, misleading, or deceptive campaign advertising". While we are inclined to agree with this conclusion, we must bear in mind that the Canons are subject to constitutional restraints. Before we can decide whether these false statements violate Canon 7, we must carefully determine the constitutional limits of the Canon's application.

There are some cases which suggest that free speech guaranties do not apply at all in disciplinary proceedings, e.g., *In re Sawyer,* 360 U.S. 622, 646, 3 L. Ed. 2d 1473, 79 S. Ct. 1376 (1959) (Stewart, J., concurring). This position has not prevailed. Where political speech is at issue, disciplinary rules are subject to exacting scrutiny under the First Amendment. *In re Primus,* 436 U.S. 412, 56 L. Ed. 2d 417, 98 S. Ct. 1893 (1978); *NAACP v. Button,* 371 U.S. 415, 438, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963). We have previously held that free speech guaranties do apply in disciplinary cases in the case of *In re Donohoe,* 90 Wn.2d 173, 580 P.2d 1093 (1978).

> We agree that a person does not surrender freedom of expression rights when becoming a licensed attorney. *Spevack v. Klein,* 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625 (1967).

*Donohoe,* at 181.

We issued two reprimands in *Donohoe,* however, because we recognized that free speech guaranties do not extend far enough to protect falsehood.

> However, we do not believe that the First Amendment protects one who utters a statement with knowledge of its falsity, even in the context of a judicial campaign. Such speech is not beneficial to the public and is generally harmful to the person against whom it is directed. The only beneficiary of the comment is the utterer thereof. On balance, such statements are not deserving of constitutional protection.

*Donohoe,* at 181. The issue which the present case presents is whether Judge Kaiser is "one who utters a statement

with knowledge of its falsity". Does *Donohoe* condemn false statements which are *actually* known to be false, or does it condemn statements which the speaker knows *or ought to know* are false? In other words, does *Donohoe* prescribe a subjective or an objective test for knowingly false statements which fall outside the scope of constitutional protection?

An examination of *Donohoe*'s facts shows that a subjective test was applied; that *Donohoe* was disciplined because she had actual knowledge of the falsity of her claims. *Donohoe* considered a series of false statements made in the course of two judicial campaigns. The false statements included the claim that:

> "[S]ince its inception, Division I of the Court of Appeals has never reversed the trial judge if the appellant was represented by a woman."

*Donohoe,* at 177. In fact Donohoe herself had successfully represented a client before Division One. She therefore had actual knowledge that her statement was false. Donohoe also asserted that Division One judges had imposed terms on an elderly litigant. In fact the terms were imposed on the elderly woman's attorney: Donohoe herself. She also altered and republished a letter written in support of her opponent, in order to give a false impression. In both of these instances, Donohoe necessarily had actual knowledge of the falsity of her statements. Her statements lost their constitutional shield because of this knowledge.

There is no such unequivocal evidence in this case that Kaiser actually knew his statements were false. Fourteen attorneys treated as DWI defense attorneys in Judge Kaiser's calculations stated that DWI defense work constituted less than 1 percent of their case load or that they had never handled a DWI case. The Special Master determined that, if these 14 names were not included in the calculation, the contributions of DWI defense attorneys amounted to only 42 percent of Roarty's total contributions. In addition, Judge Kaiser's calculations did not include in-kind contributions to the Roarty campaign, which totaled $1,872.54.

When those contributions are included, the percentage of contributions which can be said to have come from DWI defense attorneys is no more than 35 percent.

While under the Commission's interpretation the statements made by Judge Kaiser regarding Roarty's backers were false, the Commission's methodology is as open to criticism as Judge Kaiser's. A number of the 14 affidavits submitted state facts which do not bear out the affiant's conclusion that he is not a "DWI attorney." For example, one attorney stated that he had done no DWI work in the previous 4 months, but he also said that prior to that he had been a public defender and had handled DWI cases. Another stated that he had not had a DWI case in the last 3 years, but that he had handled such cases in the past. Another attorney stated that DWI cases accounted for about 1 percent of his income and another stated that his office, if not himself, handled three or four such cases per month. It seems these attorneys could reasonably be characterized as DWI attorneys.

The problem, of course, lies in the definition of "DWI attorney." There is none. Judge Kaiser and his staff employed one method for identifying those who they considered "DWI attorneys." The Special Master used a different method. Judge Kaiser acted in the middle of a closely contested campaign, under the pressure of time. The Special Master had the benefit of hindsight.

Under the circumstances, we cannot say that Judge Kaiser's statements fall outside the boundaries of the First Amendment. Even if, in hindsight, his statements turn out to have been false, there is no evidence that he had *actual* knowledge of their falsity at the time the statements were made. His statements are nothing like the blatant, knowing falsehoods of *Donohoe,* and do not fall outside the limits of constitutionally protected speech established by that case. Therefore, even though Judge Kaiser's statements violate the strict terms of Canon 7(B)(1)(d), they are constitutionally protected and there is no violation.

## JUDGE KAISER'S OTHER STATEMENTS ARE NOT CONSTITUTIONALLY PROTECTED

Judge Kaiser's other campaign statements also affect "core First Amendment rights." Therefore, he is subject to discipline only where the disciplinary rule serves a compelling state interest and where the rule is drawn and applied in a narrowly tailored fashion. The Canons as applied to Judge Kaiser's other statements meet that standard.

The Commission's brief argues that the CJC's restrictions on campaigning "are constitutionally permissible if justified by a reasonable necessity . . . to burden those activities to achieve a compelling public objective." *Morial v. Judiciary Comm'n,* 565 F.2d 295, 300 (5th Cir. 1977), *cert. denied,* 435 U.S. 1013 (1978). Judge Kaiser claims that *Morial's* standard applies to conduct, not speech, and that a higher standard therefore immunizes his statements. The Commission is correct as to the standard, but Judge Kaiser's point is well taken regarding the application of that standard to this case.

It is important to note that *Morial,* in line with *Primus,* requires a compelling state interest. Its "reasonably necessary" requirement relates to the second part of the analysis, the fit between means and ends. There, *Morial* introduces a distinction between conduct and speech, and suggests that, to the extent conduct is at issue, a looser fit between means and ends is permissible. *Morial,* at 300. Professor Tribe argues for a similar analysis. L. Tribe, *American Constitutional Law* 831–32, 1018 (2d ed. 1988).

■ Judge Kaiser has a point, however, in saying that his case involves "pure speech." Analyzing protected conduct is problematic, and *Morial's* sliding scale is helpful when the court is faced with picketing, sit–ins, the wearing of armbands, etc. Here, however, the subject of the disciplinary hearings is clearly speech. Judge Kaiser's conduct—leafletting etc.—is incidental to that speech. So while *Morial's* variable standard is valid, Judge Kaiser's activities are on the "speech" end of the spectrum, and a fairly tight fit

between means and ends is required to withstand constitutional scrutiny. Contrary to the Commission's assertions, therefore, more than a "reasonable necessity" is required to ensure a constitutionally valid application of the Canons.

The State's interest in protecting the good reputation of the judiciary is compelling, as every court which considers the issue has recognized.

> Ours is an era in which members of the judiciary often are called upon to adjudicate cases squarely presenting hotly contested social or political issues. The state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect.

*Morial,* at 302. *See Berger v. Supreme Court,* 598 F. Supp. 69, 75 (S.D. Ohio 1984); *State ex rel. Nebraska State Bar Ass'n v. Michaelis,* 210 Neb. 545, 316 N.W.2d 46 (1982); *In re Hinds,* 90 N.J. 604, 615, 449 A.2d 483 (1982); *State v. Russell,* 227 Kan. 897, 610 P.2d 1122, 1127 (1980).

The next question is whether the Canons have been so narrowly drafted and strictly applied that the compelling state interest is served without unnecessarily burdening the exercise of free speech. Judge Kaiser concedes that the Canons are facially valid; he contends only that they are invalid as applied to him. We therefore must balance the State's interest against his particular exercise of free speech. *See Berger,* at 74.

The case of *In re Baker,* 218 Kan. 209, 542 P.2d 701 (1975) is helpful in locating the proper balance between state and free speech interests. There, the Supreme Court of Kansas held that the Canons relating to judicial campaigns can and do meet constitutional requirements if they are construed to permit a broad range of fair comment on judicial qualifications. In *Baker,* a candidate who made an issue of his opponent's health was held *not* to have violated judicial Canons by suggesting that he would be better able to serve full time in the post.

> [The] candidate for nonjudicial office is free to announce his stand on the issues he must pass upon in office, and

to pledge his vote on those issues; the judicial candidate is forbidden to enter this customary campaign arena. Hence, unless the election is to be a pure popularity contest based on name recognition alone, the only legitimate area for debate is the relative qualifications of the candidates. In our view the health, work habits, experience and ability of the candidates are all matters of legitimate concern to the electorate who must make the choice.

*Baker,* at 213.

Judge Kaiser's statements to the effect that he is a "tough no–nonsense judge" refer to his qualifications, and, as *Baker* indicates, are constitutionally protected speech. However, Judge Kaiser's statements of party affiliation, statements regarding the motives of Roarty's attorney supporters and promises to be tough on DWI offenders do not refer to his or Roarty's qualifications. As *Baker* indicates, such statements are not constitutionally protected. Each of those statements falls squarely within a prohibition of the Canons and has a directly detrimental effect on the compelling state interest of preserving the integrity of the judiciary. As applied to those statements, therefore, the Canons' prohibitions are constitutionally valid.

### The Proper Sanction Is Censure

This court recently stated the considerations governing the choice of a proper sanction in judicial disciplinary cases. The court should consider the following "nonexclusive factors."

(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the

extent to which the judge exploited his position to satisfy his personal desires.

*In re Deming,* 108 Wn.2d 82, 119–20, 736 P.2d 639 (1987).

The record shows that Judge Kaiser defeated Roarty by one vote. It is safe to assume that but for the conduct condemned here, Judge Kaiser probably would have lost the election. Such analysis indicates that removal may be appropriate.

However, that sanction should be reserved for the most egregious conduct. *See In re Deming.* This court should be slow to overturn the results of an election and deprive the people of the right to elect our judges. Voters are able and intelligent enough to sort out the puffing and half–truths of election campaigns in making political decisions. They face the same phenomenon in all elections, and the notion that this court should lightly set aside the people's choice in judicial elections is no less disturbing than the notion that it should set aside the results of nonjudicial elections. If a judge flagrantly and intentionally violates his oath of office or misuses his power in performing his duties this court should fulfill its obligation to remove that judge from office. That sanction, however, should be sparingly applied. We must always remember that the alternative to free elections is a loss of democracy and the creation of a dictatorship.

While we decline to remove Judge Kaiser from office, a reprimand would be too lenient. As noted, Judge Kaiser has previously been admonished under Canon 5(B) because of his membership in the organization Mothers Against Drunk Drivers. He therefore has had fair notice of the CJC's restrictions. He knew or should have known that partisan activity and pledges and promises are improper. Kaiser's prior conduct makes these renewed pledges and promises especially flagrant. Censure is therefore the appropriate sanction.

### Conclusion

Judge Kaiser's statement of party affiliation, his pledge of partial treatment and his suggestion that DWI defense

attorneys could buy favorable treatment for their clients violate the Canons of the Code of Judicial Conduct. Kaiser's statements regarding the contributions of DWI defense attorneys to his opponent were not false within the meaning of the Canons and are constitutionally protected in any event.

Accordingly, we censure Judge Kaiser. Such censure shall be administered by this court.

DOLLIVER, CALLOW, GOODLOE, and DURHAM, JJ., concur.

ANDERSEN, J. (concurring)—I concur with Justice Dore's opinion except in one respect; I would not reach the issue of Judge Kaiser's constitutional free speech rights. This is because Judge Kaiser's statement that "My opponent . . . has received the majority of his financial contributions from drunk driving defense attorneys" is false, and in this context is not entitled to constitutional protection. *See* CJC Canon 7B(1)(c); *In re Donohoe,* 90 Wn.2d 173, 181–84, 580 P.2d 1093 (1978); *In re Baker,* 218 Kan. 209, 542 P.2d 701 (1975). "A reviewing court should not pass on constitutional issues unless absolutely necessary to the determination of the case." *State v. Hall,* 95 Wn.2d 536, 539, 627 P.2d 101 (1981).

PEARSON, C.J. (concurring in part, dissenting in part)—I concur in the majority's result and in much of its analysis. I agree that Judge Kaiser violated CJC Canon 7(A)(2)'s prohibition on statements of party affiliations, and CJC Canon 7(B)(1)(c)'s prohibition on pledges or promises of partiality. I also agree with the majority's conclusion that Judge Kaiser violated CJC Canons 1, 2(A) and 7(B)(1)(a) by suggesting that certain attorneys were attempting to buy favorable treatment for their clients and by suggesting that Mr. Roarty, if elected, would not fairly and impartially apply the law to DWI defendants. I also agree with the conclusion that such statements are not constitutionally protected.

However, I strongly disagree with the conclusion that in order to find a violation of CJC Canon 7(B)(1)(d)'s prohibition on "false, misleading, or deceptive campaign advertising" a judicial candidate must have actual subjective knowledge of the falsity of his statements.

The majority opinion is confusing on the issue of whether it finds Judge Kaiser's statements regarding DWI attorneys–supporters to be *false,* but constitutionally protected, or *not false* at all. On page 283 the majority states:

> Judge Kaiser's statements that the majority of his opponent's support came from "drunk" driving defense attorneys" violate the strict terms of Canon 7(B)(1)(d)'s prohibition on "false, misleading, or deceptive campaign advertising". However, because the statements fall within the bounds of constitutionally protected speech we find no violation.

On page 284 the majority states:

> [T]he Commission concluded that the statements concerning Roarty's funding were false and therefore violated Canon 7(B)(1)(d), which prohibits "false, misleading, or deceptive campaign advertising." While we are inclined to agree with this conclusion, we must bear in mind that the Canons are subject to constitutional restraints. Before we can decide whether these false statements violate Canon 7, we must carefully determine the constitutional limits of the Canon's application.

These statements indicate the majority recognizes that these statements were indeed *false.* However, at page 291 the majority states:

> Kaiser's statements regarding the contributions of DWI defense attorneys to his opponent were *not false* within the meaning of the Canons and are constitutionally protected in any event.

If in fact the majority recognizes that the statements were false, then Justice Andersen's concurrence should be dispositive of this entire controversy. If the statements are false, then they are unprotected and the constitutional discussion is entirely superfluous and improper. I agree with Justice Andersen that the statements were false. The

majority endorsement of Judge Kaiser's "methodology" gives permission to candidates in future campaigns to engage in any kind of slight "investigation" in order to support untrue allegations against an opponent. However, if the majority's point is that Judge Kaiser must have been absolutely and subjectively aware of the falsity of his statements before his speech can be sanctioned, then the majority is requiring an "actual malice" standard be applied in a judicial discipline context.

Judge Kaiser issued a number of statements in campaign literature that stated, "Judge Kaiser's opponent, Will Roarty, receives the majority of his financial contributions from drunk driving defense attorneys." As the majority acknowledges, the methodology used to support this allegation consisted of phone calls to Roarty supporters who were asked "if they *would* represent a person who had received a DWI." If any attorney answered in the affirmative, Judge Kaiser labeled such an attorney a "drunk driving defense attorney". This kind of blatant construction of data cannot be countenanced in a judicial campaign. Surely any lawyer who might accept one dissolution case or one criminal case could not accurately be labeled a "divorce attorney" or a "criminal attorney". The majority criticizes the Commission's methodology for determining which attorneys can be labeled "DWI defense attorneys". The majority then states that an attorney who derived *1 percent* of his income from DWI cases or whose law partners handled DWI cases "could reasonably be characterized as DWI attorneys." Majority opinion, at 286. I find the majority's conclusion that Judge Kaiser used an acceptable method for verifying his allegations to be unconvincing.

Judge Kaiser clearly implied that because Will Roarty was supported by attorneys who represented DWI clients, if elected, Roarty would not fairly and impartially adjudicate the law in DWI prosecutions. The labeling of a judicial candidate's supporters by referring to the particular type of clients they represent, and suggesting that such support indicates the candidate will be unfair in certain types of

judicial cases, is deceptive and misleading advertising in violation of Canon 7(B)(1)(d). I would hold such advertising, with or without a statistical base, is not protected speech.

However, my most serious disagreement with the majority opinion is its conclusion that statements by judicial candidates are protected unless it can be proved the candidate had actual knowledge of their falsity at the time the statements were made. This is an even higher standard than the actual malice requirement of *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). Such a standard should not be utilized in attorney or judicial discipline proceedings.

In the context of a judicial discipline case, this court has held that false statements are *not* entitled to constitutional protection. *In re Donohoe,* 90 Wn.2d 173, 580 P.2d 1093 (1978). The majority would limit *In re Donohoe, supra,* to the proposition that only statements which are *actually known* to be false can be the subject of judicial sanction. The majority states, at page 285, "Donohoe necessarily had actual knowledge of the falsity of her statements. Her statements lost their constitutional shield because of this knowledge." The majority is incorrectly limiting the holding of *In re Donohoe, supra. In re Donohoe, supra,* explained that "[a]ppellant's false statements alone are enough to support her reprimand for her campaign conduct. Consequently, we *need not decide* whether statements made by her found to be simply misleading are constitutionally protected speech." (Italics mine.) *In re Donohoe, supra* at 182. Surely *In re Donohoe, supra,* did not require actual knowledge of falsity in order to discipline a judicial candidate for statements that violate the Canons. *In re Donohoe, supra,* in fact stated:

> We feel that the minimum dignity appropriate to a judicial office is that the lawyer, judge or judicial candidate abide by the Code of Professional Responsibility.
>
> We are dealing with a delicate balancing of rights involving the public, the incumbent judge, and the lawyer

candidate for judicial office. On the one hand the courts, as an institution, are entitled to the respect due to the *office* because the acceptance of judicial decisions ultimately depends upon the citizens' belief in the integrity and impartiality of the courts. On the other hand, the members of the judiciary are subject to *legitimate* and *accurate* criticism and evaluation. A candidate for judicial office has a right to challenge an incumbent judge's ability, decisions and judicial conduct, *but it must be done fairly, accurately and upon facts,* not false representations. The voters are entitled to a fair statement and evaluation of the qualifications of the candidates.

(Some italics mine.) *In re Donohoe, supra* at 180. Judge Kaiser's criticism was neither legitimate nor accurate and this should have been obvious when the statements were made.

The "actual knowledge of falsity" requirement being imposed by the majority is in reality the first prong of the *New York Times* malice requirement. The *New York Times* malice requirement is an appropriate standard to be applied when we consciously choose to err on the side of allowing falsehoods to be uttered in the interest of freedom of the press. However, in the context of a judicial campaign, there are other competing societal concerns which override the need for unrestrained freedom of speech. The policy of leeway for untruthfulness or misrepresentation that has been allowed in the defamation context has little force in a disciplinary proceeding. The State has a compelling interest in maintaining the independence of the judiciary and in furthering public confidence in the honesty, impartiality, and integrity of judges. If the public ceases to believe that most judges are moral and fair minded, the entire system of justice flounders.

The argument that the malice standard used in libel cases should be applied to disciplinary cases was recently addressed by the Kansas Supreme Court in *In re Johnson,* 240 Kan. 334, 729 P.2d 1175 (1986). The *Johnson* court concluded, "[t]he *New York Times* standard of 'actual

malice' in a civil action for libel is not appropriate in a proceeding to discipline an attorney". The court cited with approval two reasons why the malice argument is untenable:

> First, the *New York Times* case and the supporting line of cases were clearly inapplicable to a disciplinary proceeding because those cases were defamatory actions dealing with the constitutional privilege afforded the press. Nelson, an individual, had no such constitutional right. *Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952). Second, it is widely recognized that neither civil nor criminal liability is necessary to maintain an action in a disciplinary proceeding.

*In re Johnson,* 729 P.2d at 1181 (citing *State v. Nelson,* 210 Kan. 637, 504 P.2d 211 (1972)).

The fact that we have elected judges should not allow judicial candidates to engage in unethical conduct.

> Misconduct by a Judge or judicial candidate cannot be shielded from scrutiny merely because it takes place in the political forum. The First Amendment implications, if any there be, are far outweighed by the State's interest in the integrity of its judiciary.

*Nicholson v. State Comm'n on Judicial Conduct,* 50 N.Y. 2d 597, 608, 409 N.E.2d 818, 431 N.Y.S.2d 340 (1980).

The majority cites to no authority to support the proposition that actual knowledge of the falsity of a statement is necessary before an attorney, a judge, or a judicial candidate can be subjected to disciplinary action. Neither free speech rights nor the right to engage in political activity should serve as a shield for activity which is destructive of the public trust in the judiciary. Freedom of speech is not without limitations. Other jurisdictions have recognized that, unlike a layman, a bar member's right to free speech may be regulated. *In re Johnson, supra; State ex rel. Nebraska State Bar Ass'n v. Michaelis,* 210 Neb. 545, 316 N.W.2d 46 (1982); *In re Riley,* 142 Ariz. 604, 691 P.2d 695 (1984); *Nicholson v. State Comm'n on Judicial Conduct, supra; In re Woodward,* 300 S.W.2d 385 (Mo. 1957).

A layman may, perhaps, pursue his theories of free speech or political activities until he runs afoul of the penalties of libel or slander, or into some infraction of our statutory law. A member of the bar can, and will, be stopped at the point where he infringes our Canon of Ethics; and if he wishes to remain a member of the bar he will conduct himself in accordance therewith.

*In re Woodward, supra* at 393–94.

Canon 7(B)(1)(d) of the Code of Judicial Conduct provides:

A candidate, including an incumbent judge, for a judicial office . . . should not permit false, misleading, or deceptive campaign advertising to be published or broadcast in behalf of his candidacy.

I would hold that Canon 7 has been violated if a judge or a judicial candidate knew, or with reasonable investigation should have known, of the falsity of a statement which impugns the honesty or integrity of another candidate. Free speech is of course not an absolute right, but one in which a balancing of rights is often necessary.

The interests of the legal system deserve priority over the ambitions of individual candidates. It is not unreasonable to require that an individual who is seeking to be made one of the guardians of the legal system act so as to protect that system in the means he or she employs in seeking election.

Comment, *Ethical Conduct in a Judicial Campaign: Is Campaigning an Ethical Activity?*, 57 Wash. L. Rev. 119, 137 (1981). In the context of a judicial campaign the public's rights both to learn the truth and to not be subjected to false accusations involving the honesty, integrity and independence of a judicial candidate must be balanced against a judicial candidate's right to free speech. I do not think it too great a burden on one seeking judicial office to have the duty not only to make a reasonable investigation into a charge to be made against another judicial candidate, but also to refrain from making deceptive statements about the candidate because of the candidate's or his supporter's clientele.

I agree with the majority that Judge Kaiser should be censured. But I would also serve notice that in future judicial contests political activity as was practiced here may very well warrant a more severe sanction.

UTTER and BRACHTENBACH, JJ., concur with PEARSON, C.J.