**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

DECEMBER 4, 2025

~Stgree, C. J.~
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 11 A.M.
ON DECEMBER 4, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re Disciplinary Proceeding Against<br><br>The Honorable Judge TRACY S. FLOOD,<br>Judge of the Bremerton Municipal Court. | NO. 202239-1<br><br>EN BANC<br><br>Filed: December 4, 2025 |

STEPHENS, C.J.— This case came before the court under Discipline Rules for Judges (DRJ) 2(a) and 3(a) to consider the Commission on Judicial Conduct's (Commission) decision censuring and recommending the removal of Bremerton Municipal Court Judge Tracy S. Flood, as well as Judge Flood's notice of contest. The court has reviewed the record of the public hearing, considered the briefing of the parties, and heard oral arguments on October 30, 2025. Based on de novo review of the misconduct at issue, the court now unanimously holds that censure and removal is not an appropriate sanction. Instead, a sanction of suspension is proportionate to the misconduct at issue. In considering the length of suspension, the court takes into account that Judge Flood has been off the bench since January 2025 due to the Commission's removal recommendation and did not seek reelection.

Based on Judge Flood's stipulation to violations of Code of Judicial Conduct (CJC) Rules 1.1, 1.2, and 2.8(B), as well as substantial evidence supporting violation of CJC 2.5(A), the court by majority orders that Judge Flood be censured and suspended from judicial duties for 30 days, without compensation. This 30-day period begins immediately and may extend beyond Judge Flood's current term in office. Following the period of suspension, Judge Flood will be eligible to pursue a judicial position upon completion of an approved program of judicial coaching or mentoring.

## BACKGROUND

The facts underlying this matter were fully developed during a public evidentiary hearing before a nine-member panel of the Commission and will not be set out in detail here.[1] The hearing concerned allegations that Judge Flood violated CJC 1.1, 1.2, 2.5(A), and 2.8(B). These rules provide:

> **Rule 1.1 Compliance with the Law**
> A judge shall comply with the law,[] including the Code of Judicial Conduct.

---

[1] Before the public hearing, Judge Flood sought a writ of prohibition from this court, challenging the panel, which our Supreme Court commissioner rejected. A special department of the court subsequently denied a motion to modify that decision. She renews her challenge here, and, assuming it is properly before us, we find it unavailing. Article IV, section 31 of the Washington Constitution is silent with respect to whether the Commission may act by a quorum of less than all 11 members, and it invests the Commission with authority to "establish rules of procedure for commission proceedings including due process and confidentiality of proceedings." WASH. CONST. art. IV, § 31(10). Consistent with that authority, the Commission enacted Commission on Judicial Conduct Rules of Procedure (CJCRP) Rule 3(c), which provides that 6 of 11 members constitute a quorum for the transaction of commission business. We hold that the 9-member panel was validly constituted.

2

**Rule 1.2 Promoting Confidence in the Judiciary**

A judge shall act at all times in a manner that promotes public confidence in the independence,[] integrity,[] and impartiality[] of the judiciary, and shall avoid impropriety and the appearance of impropriety.[]

**Rule 2.5 Competence, Diligence, and Cooperation**

(A) A judge shall perform judicial and administrative duties competently and diligently.

**Rule 2.8 Decorum, Demeanor, and Communication with Jurors**

(B) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity.

(Asterisks omitted.)

Prior to the start of the public hearing, the parties entered a stipulation in which Judge Flood admitted to violating CJC 1.1, 1.2, and 2.8(B). The Commission additionally found that she violated CJC 2.5(A) and recommended a sanction of censure and removal from judicial office. Because of the removal recommendation, Judge Flood has been suspended from office with salary effective January 31, 2025, by operation of Wash. Const. art. IV, § 31(8). The matter is now before this court on de novo review, as the ultimate decision to issue discipline lies with the Washington State Supreme Court. *In re Disciplinary Proceeding Against Keenan*, 199 Wn.2d 87, 94, 502 P.3d 1271 (2022).

Judge Tracy S. Flood was elected in November 2021 to serve as the sole judge for the Bremerton Municipal Court, succeeding Judge James Docter, who held that position for 24 years. She is the first woman and first Black judge to hold judicial

office in Bremerton. Soon after she took the bench in January 2022, relationships between Judge Flood and staff and attorneys at the court grew strained. All who provided testimony, including Judge Flood, described workplace friction, with several staff testifying to being unfairly criticized, belittled, or treated with condescension by Judge Flood. The record includes corroborated incidents of staff being reduced to tears and developing anxiety and distress from workplace interactions with Judge Flood, as well as admissions from Judge Flood that she had acted toward some staff and attorneys with impatience and discourtesy.[2] During the months at issue since Judge Flood took the bench in early 2022, a total of 19 staff members left the court, including staff hired by Judge Flood to replace others who had departed.

In addition to testimony from staff at Bremerton Municipal Court, the evidence presented at the public hearing includes testimony from court management professionals who volunteered assistance to the court, identifying instances they

---

[2] *See, e.g.*, 2 Tr. of Test. of Fact-Finding Hr'g (Tr.) at 229-30 (Judge Flood raised her voice at a staff member who was reduced to tears); 3 Tr. at 447-50 (staff reporting depression, anxiety, and loss of sleep due to interactions with Judge Flood); Ex. 281, at 2-4 (staff experienced harsh reaction from Judge Flood when she asked clarifying questions, even after disclosing a disability resulting from a traumatic brain injury that might require asking clarifying questions); 3 Tr. at 543, 523-24 (staff described increasing her dosage of anxiety medication over her tenure and having a panic attack after a confrontational conversation with Judge Flood); Stipulation at 5-6 (Judge Flood admitted talking to staff member in an "impatient and discourteous manner" when she admonished him and later remarked that it had been a "teaching moment" for him), 6 (Judge Flood admitted that she "treated attorneys appearing before her with discourtesy and impatience," which included "interrupt[ing] attorneys during argument or when they attempted to request clarification of a ruling," and speaking in a condescending manner that made an attorney feel embarrassed).

witnessed of harsh or condescending conduct by Judge Flood, as well as serious operational issues at the court.[3]

The evidence also includes testimony describing a backdrop of friction and escalating tension that reflects at least in part racial and gender-based bias toward Judge Flood by some staff and attorneys. Judge Flood was elected to lead a court that was described as having a predominantly white environment, where some staff were consciously or unconsciously resistant toward change in court administration and critical of her leadership as a Black woman. The court does not discount the fact that improper pushback from some staff could have contributed to the spiraling escalation of tension, and we credit the testimony identifying interactions and statements suggesting bias toward Judge Flood.[4] Some incidents involving Judge Flood's interactions with staff and attorneys are described in starkly contrasting

---

[3] The Commission found highly credible the testimony of Maurice Baker, who volunteered full-time at the court over an extended period to help understand and address the issues. See Comm'n Decision & Ord. at 13 (crediting Baker's testimony in light of "his background, motivation and experience.") LaTricia Kinlow also provided volunteer assistance as a leader in the Washington State District and Municipal Court Management Association, and her testimony concerning staff interactions with Judge Flood and operational problems at the court was found to be particularly credible. *Id.* at 12-13 (finding Kinlow's testimony "highly credible, in part because of her personal and professional background, and because of the very evident neutrality with which she approached the problems at the court").

[4] *See, e.g.*, 3 Tr. at 402-03 (staff testified about other staff calling Judge Flood by her first name outside of meetings, and gossiping and rolling their eyes behind her back), 634, 603, 611, 615 (staff who self-identifies as "African American" testified that the then all-white staff other than himself was so "anti Judge Flood" that he would have lunch in his office to avoid those conversations, and a belligerent attorney was once celebrated among staff for how he spoke to Judge Flood). Although LaTricia Kinlow testified that she did not witness behavior she recognized as micro- or macroaggressions associated with workplace racism, she acknowledged that did not mean the aggression was not there. 2 Tr. at 235, 251.

ways, and the court finds truth in the multiple perspectives. We will neither deny the role of racism in our justice system and workplace dynamics nor disregard the power dynamics at play in a court environment where court staff and litigants must ultimately answer to the presiding judge.

Considering the full record, violations of CJC 1.1, 1.2, and 2.8(B) are established. Judge Flood has appropriately stipulated to misconduct under these rules, and the record demonstrates multiple instances where Judge Flood's conduct was impatient, discourteous, harsh, or condescending to both staff and litigants.

In addition, the record substantiates a violation of CJC 2.5(A), concerning a judge's duty to diligently and competently manage the work of the court.[5] While Judge Flood diligently attempted to fill staff vacancies as they occurred, credible testimony establishes that persistent operational issues at Bremerton Municipal Court were more than the result of staff attrition. These problems included operational issues that arose from policies and procedures instituted by Judge Flood, such as (1) the failure to timely exonerate bonds and delays in the updating of

---

[5] We reject Judge Flood's argument that the parties' stipulation precludes the consideration of any allegations of misconduct beyond those enumerated in the stipulation. This argument is not supported by the language of the stipulation and is inconsistent with the course of proceedings before the Commission and our de novo review. We hold that both the stipulated violations and the violations of CJC 2.5(A) are appropriately considered in assessing the scope of Judge Flood's misconduct and fashioning an appropriate sanction.

dockets;[6] (2) the failure to disburse restitution and mislabeling docket entries that Judge Flood failed to correct;[7] and (3) issues of poor communication with the prosecutor's office and police department regarding no-contact orders, restoration orders, and warrants.[8]  The prosecutor's office, as well as volunteer advisors, attempted to counsel Judge Flood to address these persistent issues.  Judge Flood bore responsibility for the operation of the court, and despite understandable difficulties of management under a court stretched thin due to staffing shortages, she fell short in her duty to prioritize resolving them.

---

[6] Bremerton Municipal Court had a "drawer full of bail bonds that had not been exonerated."  Ex. 286, at 3.  That is usually the responsibility of the court clerk after the judge makes a ruling, but Judge Flood "had instead instituted a different process requiring additional steps, including an additional hearing, and the process had gotten bogged down because of the staff turnover," and she "did not seem amenable to changing what she had instructed, even though it was making more work and causing things to fall behind."  *Id.* at 3-4.  Docketing of cases was also significantly delayed and disorganized because Judge Flood expected in-court clerks to fill out judgment and sentence forms for which they did not have the requisite legal training and that distracted them from docketing.  The task then fell on the shoulders of temporary employees who were clueless about the process.  *Id.* at 4; *see also* 2 Tr. at 287; Ex. 285, at 2.

[7] Bremerton Municipal Court "had been collecting victim restitution payments but not sending the restitution checks out," holding onto approximately $40,000 at one point.  Ex. 286, at 4; 3 Tr. at 516.  The prosecutor's office had to track restitution disbursements, even in cases where the defendant had been making payments regularly, because victims informed the office that they had not been receiving the payments from the court.  2 Tr. at 301-03.  Entries on dockets were mislabeled, sometimes under Judge Flood's instructions.  *Id.* at 247, 289; 3 Tr. at 508.

[8] Restoration orders through which Bremerton Municipal Court communicates with Western State Hospital to start treatment for defendants to restore competency were delayed, and in one case caused a defendant to sit in jail for 30 days until the prosecutor's office checked with the hospital and found out the hospital had never received the restoration order.  2 Tr. at 304, 308-09.  Warrants were also not timely communicated, and in one case, a warrant that had been quashed but not communicated to the police did lead to a false arrest.  *Id.* at 314.

We now turn to consideration of the appropriate sanction. In a judicial discipline matter, it is essential to focus on the violations of judicial canons reflected in the judge's behavior and the impact of a sanction in remedying misconduct. Not every consequence flowing from workplace friction and staff attrition should be attributed solely to the judge. While it is true that "the buck stops" with the judge presiding over their court, our role in this matter is limited to fashioning an appropriate, proportional sanction relative to Judge Flood's conduct.

## SANCTION ANALYSIS AND DISPOSITION

As noted, the court reviews decisions and recommendations of the Commission de novo; this "requires an independent evaluation of the record," though "the Commission's findings and recommendations are given considerable weight." *Keenan*, 199 Wn.2d at 94. We "necessarily give considerable weight to credibility determinations by the Commission, as the body that had the opportunity directly to observe the witnesses and their demeanor" and "give serious consideration to the Commission's recommended sanctions." *In re Disciplinary Proceeding Against Anderson*, 138 Wn.2d 830, 843, 981 P.2d 426 (1999).

The Court may "impose the sanction recommended by the commission, or any other sanction that the Supreme Court deems proper." DRJ 9(c). We apply factors addressing the character of the misconduct and the service and demeanor of the judge to determine what sanction is proportionate to the misconduct, known as the

8

"*Deming* factors." *See In re Disciplinary Proceeding Against Michels*, 150 Wn.2d 159, 166, 75 P.3d 950 (2003) (quoting *In re Disciplinary Proceeding Against Deming*, 108 Wn.2d 82, 119-20, 736 P.2d 639 (1987)). We also consider the overlapping factors set out in Commission on Judicial Conduct Rules of Procedure (CJCRP) 6(c). *See In re Disciplinary Proceeding Against Eiler*, 169 Wn.2d 340, 353, 236 P.3d 873 (2010) (plurality opinion).

Applying these factors to the facts before us, the court unanimously rejects the Commission's recommendation of censure and removal. Removal is the ultimate, permanent sanction for judicial misconduct and has been limited to flagrant and intentional violation of the oath of office or misuse of power. Absent misconduct meeting this high threshold, "the people's choice in judicial elections should not be 'lightly set aside.'" *In re Disciplinary Proceeding Against Turco*, 137 Wn.2d 227, 251-52, 970 P.2d 731 (1999) (quoting *In re Disciplinary Proceeding Against Kaiser*, 111 Wn.2d 275, 290, 759 P.2d 392 (1988)). When the misconduct found here is considered in full context, the high threshold for a sanction of removal is not met. We hold by majority that the proportionate sanction is suspension, followed by remedial services prior to returning to judicial service.

We first consider the violations of CJC 1.1, 1.2, and, 2.8(B). In past cases, we have recognized the importance of "patience, dignity, and courtesy expected of members of the judiciary" in view of the great authority and power of judges that

amplifies the impact of their behavior in their chambers and on the bench. *Eiler*, 169 Wn.2d at 351; *see also* Ord., *In re Tollefson*, No. 70051-6 (Aug. 30, 2000) (ordering suspension of a judge for intemperate language and behavior, among other violations). An appropriate sanction must take into consideration the multiple incidents in which Judge Flood engaged with staff or attorneys in a harsh, rude, or belittling manner inconsistent with the high standards for judicial conduct.

We also consider violations of CJC 2.5(A), concerning judicial diligence and competence. While we do not underestimate the formidable challenges of managing a single-judge court, especially in the first few years of judicial service, judges bear ultimate responsibility for court operations, and how a judge performs their duties impacts public trust and confidence in our legal system. CJC 2.5(A) provides that "[a] judge shall perform judicial and administrative duties competently and diligently." We find that CJC 2.5(A) is violated when, as here, a judge knows or should have known that policies or practices they enact or fail to correct substantially impact the court's normal functioning in a way that potentially harms the life, liberty, property, or other substantial interests of those subject to the court's power. Our consideration of sanction must therefore include Judge Flood's violation of CJC 2.5(A).

Applying a formulation of the *Deming* factors under CJCRP 6(c), the Commission concluded that Judge Flood's misconduct warrants censure and

removal, based mostly on the belief that Judge Flood would not be amenable to coaching and in light of the serious operational issues that resulted from staff departures. The Commission also found that Judge Flood's noncooperation impacted the disciplinary proceedings.[9] We disagree with the Commission's analysis.

The Court does not share the Commission's unmitigated pessimism for improvement by Judge Flood. Judge Flood faced a difficult management crisis as a first-time judge in a one-judge court. She actively sought help from court management professionals to address staff and operational problems amidst the crisis. Whether she implemented all the advice offered is not dispositive of her openness to coaching or mentoring, especially given that the assistance offered was focused on addressing operational problems at the court and did not include a judge

---

[9] The Commission noted the delay in scheduling the fact-finding hearing due to Judge Flood's request for an extension based on health issues and her subsequent recalcitrance in reporting the details of her medical condition. Judge Flood argued that she was cooperative and, in her reply brief in this court, she attached additional documentation of a recent medical diagnosis of a serious condition. The Commission moved to strike, and we passed the motion to the merits. We now deny the motion. DRJ 7 states that the court may on its own motion "accept supplementary materials without remand." While information about Judge Flood's recent diagnosis is not strictly necessary to our decision, it reflects the basis for Judge Flood's genuine concern for her health during the disciplinary proceedings, which mitigates against finding that she failed to cooperate with discipline proceedings. Our conclusion that Judge Flood did not exhibit noncooperation that justifies a harsher sanction should not be misinterpreted as undermining CJC 2.16 (requiring judicial officers to cooperate with the Commission's proceedings). The record establishes that Judge Flood was not fully cooperative with the proceedings, especially early in the process, but we do not find that the record supports deliberative defiance.

mentor or coach.[10] The Commission also cast doubt on Judge Flood's demeanor at the hearing. Though we generally give deference to the Commission on credibility and demeanor of witnesses, we perceive the facts differently. Judge Flood demonstrated that she is amenable to improvement. She entered into a formal stipulation acknowledging misconduct and committing to taking affirmative steps to address the issues. Further, a central premise of judicial discipline is a presumption that judges will heed court orders—otherwise, admonishment, reprimand, censure, or even suspension would be meaningless sanctions. Especially when conduct does not involve flagrant and intentional violations of the oath of office or a misuse of power, we must start with the presumption that court-ordered coaching and mentoring will make a difference. We find from the record that Judge Flood has the desire to be a successful judge, and that with the appropriate training and mentoring, she might yet pursue a judicial position.[11]

We believe a sanction of suspension rather than removal is more proportionate to Judge Flood's misconduct. Precedents provide guidance in considering proportionality. Past cases establish that removal from office—the highest

---

[10] LaTricia Kinlow, whose testimony was chiefly relied on by the Commission, agreed that Judge Flood would benefit from judicial mentoring, just as have other judges in solo courts who have experienced mentors. 2 Tr. at 248.

[11] Judge Flood did not seek reelection in 2025. *See General 2025*, VOTEWA, https://voter.votewa.gov/CandidateList.aspx?e=894&c=18 [https://perma.cc/Q4PE-YMQ4].

sanction—is appropriate for flagrant and intentional violations of oath of office or misuse of power. *Turco*, 137 Wn.2d at 251-52 (citing *Kaiser*, 111 Wn.2d at 290). Judge Flood did not "flagrantly and intentionally" violate her oath of office or misuse her power as in past removal cases involving harassing, abusive, or deceitful behavior. This court has only ordered removal in three cases, which involved (1) sexual misconduct, sexual harassment, threats to staff, *see Deming*, 108 Wn.2d at 86, (2) improper conversion of public funds for personal benefit and related dishonesty, *see In re Disciplinary Proceeding Against Ritchie*, 123 Wn.2d 725, 732-34, 870 P.2d 967 (1994), and (3) financial self-dealing by continued participation in for-profit corporations combined with deliberate misrepresentation and failure to disclose, *see Anderson*, 138 Wn.2d at 857. Judge Flood's failure to be patient, dignified, and courteous clearly harmed several staff members and resulted in staff attrition and ensuing operational issues that she failed to competently resolve. We do not minimize this misconduct or downplay its consequences; however, the context here does not describe judicial misconduct that is comparable to the conduct in those prior removal cases.

The misconduct in this case instead resembles cases in which we have imposed suspension, especially cases involving harsh or abusive conduct. In *Eiler*, for example, a plurality and concurrence of the court imposed a 5-day suspension on a jurist who engaged in insulting and condescending language against pro se litigants

and who had not been deterred by prior disciplinary sanctions, 169 Wn.2d at 354-58. A four-justice dissent would have imposed a 90-day suspension. *Id.* at 362-64 (Alexander, J., dissenting). In *Tollefson*, the Court by order imposed a 5-month suspension on a judge who stipulated to multiple violations including intemperate and angry language towards court staff and other judges, entering ex parte orders without giving notice to parties, as well as conducting his own investigation in cases and requesting that a reporter write a particular article about a party before him. Ord., No. 70051-6 (Aug. 30, 2000).[12]

The parties focus on parallels to *Eiler*. The Commission argues that Judge Flood's conduct is much more serious than the misconduct in *Eiler* based on the consequences that followed: "While Judge Eiler was disciplined for rude courtroom behavior generally directed towards litigants, Judge Flood's conduct drove away competent staff, resulting in a chronically dysfunctional court that harmed not only the employees who left their positions as a result of her actions, but also the public by, for example, failing to timely issue and recall warrants and protection orders, mislabeling dockets, mishandling funds, delaying competency evaluations, and failing to provide timely restitution payments." Resp. Br. of Comm'n on Jud.

---

[12] The court's dispositional order in *Tollefson* does not describe the acts of misconduct with particularity in adopting the stipulation of the facts, but it notes harsh, abusive language against court staff. *See* Statement of Charges, *In re Tollefson*, No. 98-2699-F-81 (Wash. Comm'n Jud. Conduct Dec. 16, 1999); Stipulation, Agreement & Ord. of Censure, & Recommendation for Suspension, *In re Tollefson*, No. 98-2699-F-81 (Wash. Comm'n Jud. Conduct Aug. 21, 2000).

Conduct at 48-49. As noted above, we caution against attributing all downstream consequences to Judge Flood and focus on her conduct. While Judge Flood's violations of the CJC 2.5(A) standard of competency did cause harm, certain factors in this case mitigate in her favor.

First, unlike in *Eiler*, Judge Flood has never defied judicial disciplinary orders. 169 Wn.2d at 356-57. Second, while both Judge Eiler and Judge Tollefson had close to 20 years of judicial experience, Judge Flood has served on the bench for less than 4 years. Our precedents have viewed long tenure to be an aggravating factor.[13] Especially with respect to CJC 2.5(A) violations, Judge Flood's relative inexperience appears to have understandably played a role contributing to the escalation of operational problems at the court.

Third, while the presence of CJC 2.5(A) violations distinguishes this case from *Eiler*, here the CJC 2.5(A) violations do not reflect a flagrant or intentional disregard of duties, such as suggested in *Tollefson*. Judge Flood made diligent attempts to fill vacancies and seek professional advice but failed to meet the standard of competence and diligence expected of a judge in managing their court.

---

[13] *See, e.g.*, *Eiler*, 169 Wn.2d at 354 ("Judge Eiler's long years on the bench [of almost twenty years] aggravate, rather than mitigate, her misconduct—she should know better."); *Michels*, 150 Wn.2d at 171-72 ("The fact that Judge Michels failed to keep current on the status of the law in spite of his years of service on the bench is troublesome. Sixteen years is a considerable amount of time to sit on the bench.").

On the other hand, the record here demonstrates conduct toward staff that was not limited to one or two instances and caused serious harm, serious enough that multiple staff members left their employment with the court as a result. We are particularly concerned with evidence of staff being reduced to tears and experiencing depression and anxiety due to their interactions with Judge Flood. The scope of misconduct involving harsh, discourteous, or belittling behavior toward staff warrants a longer period of suspension than in the *Eiler* case, though not as long a period of suspension as in the *Tollefson* case.

Considering all factors and the particular facts of this case, a proportionality analysis could support a sanction of 60-90 days, based on Judge Flood's violations of CJC 1.1, 1.2, 2.5(A), and 2.8(B). However, we find it appropriate to reduce this sanction to a 30-day suspension, followed by remedial services should Judge Flood desire to return to judicial service. A relevant consideration is the impact of a suspension on judicial behavior and public trust and confidence in the courts. Here, Judge Flood has been suspended with salary since January 2025 under article IV, section 31 of the Washington Constitution because of the Commission's removal recommendation, which we reject. While suspension with salary is not properly regarded as a "sanction," we consider its impact on Judge Flood and the people of Bremerton. Such a lengthy period of suspension from office underscores for the judiciary and the public the seriousness of the misconduct at issue. Holding judicial

office is a great honor and responsibility, and the impact of being publicly suspended from office based on the Commission's recommendation of permanent removal cannot be disregarded. We further consider that Judge Flood did not seek reelection this year, with the filing period falling during her suspension under article IV, section 31, and that her term of office will end on December 31, 2025. We hold by majority that a 30-day period of suspension is a proportionate sanction in this case.

CONCLUSION

The court has the responsibility to maintain trust and confidence in our justice system by holding judges accountable for the position they occupy in the community and the substantial power they wield over staff, attorneys, and parties who come before them.

Judge Flood stipulated that she engaged in conduct that was rude, condescending, or harsh toward staff and litigants, in violation of CJC 1.1, 1.2, and 2.8(B). Substantial evidence supports the violation of these rules, as well as the allegation that Judge Flood violated CJC 2.5(A) in failing to diligently and competently manage court operations. While the conflict and operational issues at Bremerton Municipal Court are attributable to multiple factors that do not fall on Judge Flood alone, and the court does not discount the role of racial or gender-based bias in some staff interactions with Judge Flood, as presiding judge she bore

responsibility to protect the liberty and property interests of those subject to the court's power and she fell short in meeting this obligation.

The court rejects the Commission's recommendation to remove Judge Flood from office. Removal is a disproportionate sanction because Judge Flood's conduct did not involve flagrant and intentional violations of her oath of office or the misuse of power that is present in other removal cases. Moreover, the court disagrees that Judge Flood could not benefit from appropriate judicial coaching or mentoring, and therefore she should have the opportunity to return to judicial office in the future upon receiving such services.

Based on the violations of CJC 1.1, 1.2, 2.5(A), and 2.8(B), the court hereby orders that

(1) Judge Flood shall be censured and suspended from the Bremerton Municipal Court bench without compensation for a period of 30 days. This period shall begin immediately and may extend beyond her current term in office;

(2) following the period of suspension, Judge Flood shall be eligible to pursue a judicial position upon completion of a program of remedial services involving judicial mentoring or coaching approved by the chief justice.

_____
Stephens, C.J.

WE CONCUR:

_____
 

_____
        Murphy, J.P.T.

_____
       Madsen, J.

_____
       Berns, J.P.T.

_____
 Lawrence-Berrey, J.P.T.

_____
       Toynbee, J.P.T.

_____
   Cooney, J.P.T.

_____
      Thompson, J.P.T.

*In re Disciplinary Proceeding Against Judge Tracy S. Flood*

No. 202239-1

JOHNSON, J. (dissenting)—Judge Flood has been suspended since January 2025 pursuant to an erroneous commission order. I agree the commission recommendation for removal is unjustified, as the majority correctly determined. Logically, to me, the suspension resulting from that erroneous decision should not have occurred, but the fact remains that Judge Flood has been suspended for almost one year. I find that no additional suspension should be imposed.

_____
Johnson, J.